

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-18-00264-CV

_____

CARROLL INDEPENDENT SCHOOL DISTRICT, Appellant

V.

NORTHWEST INDEPENDENT SCHOOL DISTRICT, JOSH WRIGHT, MARK
SCHLUTER, STEVE SPROWLS, JUDY COPP, ANN DAVIS-SIMPSON, LILLIAN
RAUCH, AND RYDER WARREN, IN THEIR OFFICIAL CAPACITIES ONLY,
Appellees

On Appeal from the 141st District Court
Tarrant County, Texas
Trial Court No. 141-210251-05

Before Sudderth, C.J.; and Bassel, J.[1]
Memorandum Opinion by Chief Justice Sudderth

---

[1]The Honorable Lee Gabriel, former justice of this court, was a member of the panel at the time this case was argued. She did not participate in this opinion because she retired on December 31, 2020.

**MEMORANDUM OPINION**

## I. Introduction

This is the fourth appeal[2] in a boundary dispute between two school districts—Appellant Carroll Independent School District and Appellee Northwest Independent School District.[3] The prior three appeals have dealt with three pleas to the jurisdiction. When the case finally went to trial 13 years after it was filed, the testimony focused on what the term "the County Line" meant in the property description in the 1949 commissioners court orders that created Northwest and how that term's use informed the meaning of the 1959 commissioners court order creating Carroll. Carroll argued that the term referred to the line known as the Gilley line, which was judicially determined decades after the commissioners courts' orders issued to be the actual boundary between Denton and Tarrant counties in a lawsuit between the counties to which the school districts were not parties. *See Tarrant Cty. v. Denton Cty.*, 87 S.W.3d 159, 175 (Tex. App.—Fort Worth 2002, pet. denied) (op. on reh'g),

---

[2]The prior appeals in the order in which they were decided are as follows: *Carroll ISD v. Nw. ISD* (*Carroll I*), 245 S.W.3d 620 (Tex. App.—Fort Worth 2008, pet. denied); *Nw. ISD v. Carroll ISD* (*Carroll II*), 441 S.W.3d 684 (Tex. App.—Fort Worth 2014, pet. denied) (op. on en banc reconsideration); and *Carroll ISD v. Nw. ISD* (*Carroll III*), 502 S.W.3d 919 (Tex. App.—Fort Worth 2016, no pet.) (en banc).

[3]In its sixth amended petition, Carroll added Northwest superintendent Karen G. Rue and Northwest trustees Josh Wright, Mark Schluter, Devonna Holland, Judy Copp, Ann Davis-Simpson, Mel Fuller, and Lillian Rauch, suing each in his or her official capacity only. They are Appellees along with Northwest. For the sake of consistency with Carroll's claims, we refer to these individuals as "the individual defendants."

*disapproved on other grounds by Martin v. Amerman*, 133 S.W.3d 262, 268 (Tex. 2004). Northwest contended that the term meant the county line that had been surveyed by George White from December 1852 to January 1853 and that was later retraced by W.C. Wilson in 2000, i.e., the county line as it was understood to be located in 1949, regardless of whether it had been correctly surveyed at that time.[4] After holding a three-day bench trial, the trial court signed a judgment denying Carroll's request for a declaratory judgment that the Gilley line is the boundary between the two school districts, granting Northwest's request for a declaratory judgment that the school districts' common boundary line is the line retraced by surveyor Wilson (known as the White line) and therefore that the disputed territory between the White and Gilley lines is in Northwest, and awarding Northwest attorneys' fees.

In six issues, Carroll argues that (1) the school districts' common boundary line is the Gilley line, the actual county line defined by the legislature and finally located in the *Tarrant County* suit; (2) the trial court erred by "reestablishing" the White line as the county line contrary to the *Tarrant County* judgment; (3) the *Tarrant County* suit ascertained the location of both the county line and the school districts' common boundary; (4) contrary to some of the trial court's findings and conclusions, the trial court had jurisdiction to decide Carroll's claim about the location of the school

---

[4]Alternatively, Northwest claims that the term refers to the taxing line, a line between the districts mapped by the local appraisal district for property-tax-assessment purposes that closely follows the White line. Because we resolve the issue in favor of Northwest's main argument, we do not address this alternative argument.

districts' common boundary; (5) alternatively, Carroll did not acquiesce in a taxing line mapped by the local appraisal district as the school districts' common boundary; and (6) Northwest cannot recover a declaratory judgment or attorneys' fees, and, alternatively, the award of attorneys' fees is excessive. Northwest requests in its brief that we modify the judgment to (a) replace the current reference to a Bates-stamped exhibit in the voluminous record where the White line's coordinates can be found with a specific description of those coordinates and (b) correct a typographical error in the attorneys' fees paragraph.

We decide Carroll's issues as follows:

(1) Our review of the record demonstrates that the context of the 1949 orders makes clear that "the County Line" reference therein is a metes-and-bounds descriptor that refers to a line on the ground that had been surveyed by White in 1852–1853 and that was the only county line that was in existence when the orders were drafted, regardless of whether it was then an accurate location of the counties' actual boundary; thus, "the County Line" reference is not to a line that was finally accurately surveyed over 50 years later in the *Tarrant County* suit that established the counties' boundaries pursuant to an Interlocal Cooperation Agreement that did not involve the school districts.

(2 & 3) Because the *Tarrant County* decision did not establish the school districts' common boundary, the trial court in this case did not "reestablish" the

4

county line contrary to that decision; instead, the trial court merely interpreted the term "the County Line" as used in the 1949 orders.

(4) We previously determined in *Carroll III* that the trial court had jurisdiction to determine Carroll's claim about the location of the school districts' common boundary, so the trial court erred to the extent that it made findings of fact and conclusions of law that ignored the law of the case. But such errors were not reasonably calculated to cause nor did they cause the rendition of an improper judgment.

(5) Because we hold that "the County Line" descriptor in the 1949 orders refers to the White line, we need not address Carroll's alternative arguments related to the taxing line.

(6) The school districts brought competing claims to have the 1949 orders interpreted, and we have previously held that these claims fall under the Declaratory Judgments Act (DJA). Carroll is therefore not immune from Northwest's counterclaim seeking a declaratory judgment on the interpretation of "the County Line" descriptor in the 1949 orders. Because Northwest prevailed on its declaratory-judgment claim and attorneys' fees are recoverable under the DJA, the trial court properly awarded Northwest its attorneys' fees. Carroll waived its excessiveness argument, which is actually a complaint that the fees were not segregated.

With regard to Northwest's requested modifications to the judgment, we modify the judgment (a) to specifically state that the referenced Bates-stamped pages are attached and to attach those pages to it via this opinion and (b) to correct the typographical error. We therefore affirm the judgment as modified.

## II. Background

### A. Brief Summary of the Boundary Dispute[5]

As we stated in the most recent opinion in this series of appeals, "The factual and procedural history of this case is byzantine, protracted, and laborious," *Carroll III*, 502 S.W.3d at 920, but the boundary dispute can be summarized as follows: "[B]oth school districts are claiming an area that lies between the White line on the south and the Tarrant–Denton County line [the Gilley line] on the north," *Carroll I*, 245 S.W.3d at 623. "This disputed area . . . encompasses 842 acres and, apparently, [fewer] than 200 students. Northwest currently levies and collects taxes in the disputed area." *Carroll III*, 502 S.W.3d at 920. As of 2017, the disputed area contributed approximately $3.8 million to Northwest's budget.

### B. *Carroll I, II,* and *III*

In *Carroll III*, we summarized the prior proceedings as follows:

Carroll filed suit against Northwest in 2005 over the location of the districts' boundary line. Northwest filed a plea to the jurisdiction, the trial court granted the plea, and Carroll filed an interlocutory appeal. We

---

[5]Detailed testimony about the school districts' boundaries is set forth below in the section discussing the bench trial—II.C.2.c.

6

reversed the trial court's order and remanded [the case] to the trial court "for further proceedings" after concluding that the trial court had jurisdiction over Carroll's claims for trespass to try title and for a declaratory judgment regarding its rights and duties in the disputed area. [*Carroll I*, 245 S.W.3d at 625–26.] We specifically stated that Carroll was "not attempting by its suit to change the existing boundary line between the two school districts" or seeking "to detach and annex the [d]isputed [a]rea from Northwest"; rather, Carroll was simply seeking "a judicial determination regarding in which of these districts the [d]isputed [a]rea is, and always has been, located." *Id.* at 624–25.

On remand,[6] Carroll amended its petition to allege that although Carroll "contends that the common boundary between the two school districts is located on the county line," Northwest "has disputed this contention in public filings and otherwise." Northwest filed a second plea to the jurisdiction, which the trial court denied. Northwest filed an interlocutory appeal from the trial court's denial. In three opinions on en banc reconsideration, we affirmed the trial court's denial and, in a corrected judgment, remanded the case to the trial court for [a] trial "regarding the meaning of the orders and judgments creating the actual boundary location between the two school districts." [*Carroll II*, 441 S.W.3d at 694–96.]

*Id.* at 920–21.

After the *Carroll II* remand, Carroll again amended its petition, adding Northwest's trustees and superintendent as defendants for the purpose of raising an ultra vires claim.[7] *Id.* at 922. In its ultra vires claim, Carroll alleged that the trustees

---

[6]After we handed down *Carroll I*, Northwest filed a counterclaim seeking a declaratory judgment that the disputed territory and the students residing in that territory are located, and have always been located, within the boundaries of Northwest and that Northwest has all the rights and obligations consistent with the disputed territory's being located within its boundaries. Northwest also sought attorneys' fees.

[7]Carroll again raised its claim that Northwest disputed that the county line was the districts' boundary "in public filings and otherwise." *Carroll III*, 502 S.W.3d at 922

7

and superintendent, in their official capacities, had committed "illegal, unauthorized[,] and *ultra vires*" actions by exercising authority over the disputed area.[8]  *Id.*  With regard to Carroll's ultra vires claim, our previous opinion further stated that

> Northwest filed a combined third plea to the jurisdiction, special exceptions, and a motion for summary judgment.  In its special exceptions and motion for summary judgment, Northwest argued that Carroll's ultra vires claim impermissibly exceeded the scope of this court's remand.  In its plea to the jurisdiction, Northwest contended that Carroll's ultra vires claim was not ripe because it depended on uncertain, contingent, or hypothetical future events—a judicial determination that the disputed area is located within Carroll's boundaries—which "likely" would never occur based on this court's limited remand in *Carroll II*.  Northwest also moved to quash some of Carroll's requested discovery, specifically Carroll's request for demographic data to determine the number of students in the disputed area[] because such inquiry, again, was outside the scope of this court's remand.

> On December 17, 2015, the trial court held a hearing on Northwest's combined motion.  At the hearing, the parties and the court discussed several scheduling deadlines in preparation for trial.  The trial court then denied Northwest's motion to quash Carroll's discovery request for demographic information.  In arguing its plea to the jurisdiction, Northwest stated that the trial court did not have subject-matter jurisdiction over Carroll's ultra vires claims against the trustees and superintendent and that the only issue that could be tried on remand

n.3.  Carroll asserted that, other than the ultra vires claim, the sixth amended petition was "a verbatim copy of [its] Fifth Amended Petition," which was at issue in *Carroll II*. *See id.* (citing *Carroll II*, 441 S.W.3d at 693).

[8]Carroll asserted that this claim was necessary to "forestall[]" Northwest's immunity argument. *Carroll III*, 502 S.W.3d at 922 n.3 (citing *City of El Paso v. Heinrich*, 284 S.W.3d 366, 372–73 (Tex. 2009), and explaining that an ultra vires claim brought against a governmental actor in his official capacity is not barred by sovereign immunity because such a claim asserts that the actor "acted without legal authority" and thus does "not seek to alter government policy but rather to enforce existing policy").

8

was "[w]here on the ground is the line that the parties have historically recognized and acquiesced to for the last 60 years." Northwest then argued that because the disputed area "is not going to change hands" based on the limited nature of this court's remand, Carroll's ultra vires claim was not ripe. The trial court denied the plea and the special exception. After Carroll confirmed that it and Northwest could not agree on what issues were properly before the trial court on remand, the trial court stated on the record that "everything" would be tried so [that] this court could decide any appeal without the necessity for further trial-court proceedings[.]

. . . .

Northwest filed an interlocutory appeal from the trial court's denial of its plea to the jurisdiction asserting that Carroll's ultra vires claim was not ripe, divesting the trial court of jurisdiction. Northwest also filed a petition for a writ of mandamus or prohibition, arguing that the trial court's stated intention to try "everything" was an abuse of discretion because the trial court's jurisdiction was limited to the parameters of this court's remand, which did not include the ultra vires claim. *See generally Harris Cty. Children's Protective Servs. v. Olvera*, 77 S.W.3d 336, 342–43 (Tex. App.—Houston [14th Dist.] 2002, pet. denied) (concluding trial court did not have jurisdiction to determine claim on remand that fell outside the scope of appellate court's specific remand).

*Id.* at 922–23. We held in the appeal that the trial court had subject-matter jurisdiction over Carroll's claims "as currently pleaded," and we affirmed the trial court's order denying Northwest's third plea to the jurisdiction. *See id.* at 925. We further held that, based on this jurisdiction, the trial court did not abuse its discretion by stating that it intended to adjudicate all claims before it. *See id.* Therefore, we denied Northwest's petition for a writ of mandamus or prohibition. *See id.*

9

**C.    Proceedings after *Carroll III***

**1.    Subsequent filings**

After our decision in *Carroll III*, Carroll did not amend its sixth amended petition. Northwest, however, filed its seventh amended answer, denying all allegations contained in Carroll's sixth amended petition and Carroll's first amended answer to Northwest's first amended counterclaim. Additionally, Carroll filed a motion for summary judgment, arguing that because this court had held in *Tarrant County* that the White line is not and has never been the actual county line, Northwest's declaratory-judgment counterclaim is barred by res judicata. Northwest filed a response, and Carroll filed a reply. The trial court denied Carroll's summary-judgment motion, and the case proceeded to a bench trial.

**2.    Bench Trial**

The purpose of the trial was to determine "the meaning of the orders and judgments creating the actual boundary location between the two school districts." *See Carroll III*, 502 S.W.3d at 920–21 (quoting *Carroll II*, 441 S.W.3d at 694–96). During the trial, the majority of the testimony consisted of a battle of the experts.[9] Northwest's main expert was Garey Gilley, and he spent most of his testimony going

_____

[9]The record also includes testimony from previous and then-current superintendents and various other individuals who were not surveyors. Because those witnesses did not provide testimony on the meaning of the descriptor "the County Line" as used in the 1949 orders, we omit their testimony from our consideration of the issues.

10

through the "orders and judgments" that created Northwest's and Carroll's predecessor school districts because, as explained in more detail below, Northwest and Carroll were formed by consolidating numerous predecessor school districts, each with its own metes-and-bounds description of its boundaries. Because the predecessor school districts' boundary descriptions were used in the property descriptions in the "orders and judgments" that created the boundaries for Northwest and Carroll, Gilley relied on the orders creating the predecessor school districts and explained how their metes-and-bounds descriptions that used "the County Line" as a descriptor for the lines on the ground defining the districts' boundaries were carried forward to the 1949 orders. Gilley distinguished "the County Line" descriptor used in the 1949 orders from the true county line (one that acts as a boundary between political subdivisions) and said that "the County Line" descriptor at issue here referenced a certain "line . . . called for in the descriptions." Using the metes-and-bounds descriptions, he was able to locate that line and determine that it referred to the county line as surveyed by White in 1852–1853. Carroll's experts ignored the relevancy of the predecessor school districts; discounted the White line because White had incorrectly surveyed the actual boundary between Tarrant and Denton Counties; and claimed that "the County Line" referenced in the orders creating Northwest and Carroll was the correct demarcation between the two political subdivisions (the counties' boundaries), which was indefinite in 1949 and 1959 and was not certain until Gilley surveyed it in 2004 following the dictates in the *Tarrant County* suit's judgment.

Because each of the prior appeals dealt with procedural issues, we did not recite in our prior opinions the underlying facts about the creation of the school districts or provide details of the surveys and retracements of the county line. We therefore continue our summary of the bench trial by setting forth the school districts' history and then proceed to the survey history of the county line.

### a. Creation of the School Districts[10]

In 1884, the Texas Legislature passed legislation establishing a system of public free schools. The legislation, which is referred to as "the school law of 1884," required the county commissioners courts of "all counties . . . to subdivide their respective counties[] into convenient school districts."[11] The law further required the county commissioners courts "to give the metes and bounds of each district[] and . . . [to] designate the same carefully by giving the whole surveys and parts of surveys,

----

[10]We found helpful Northwest's summary of the creation of the two school districts. While Carroll does not provide such history in its opening brief or in its reply brief, Carroll's reply brief does, however, reference Northwest's summation of the history and then states, "This lengthy narrative consumes over 20 [sic] pages, and it quickly becomes a full-throated argument, complete with case citations." We do not include all 13 pages of history from Northwest's brief, and we omit any argument that Northwest included in the history portion of its brief.

[11]Act of Feb. 4, 1884, 18th Leg., 1st C.S., ch. 25, § 29, 1884 Tex. Gen. Laws 38, 43, *reprinted in* 9 H.P.N. Gammel, *The Laws of Texas 1822–1897*, at 575 (Austin, Gammel Book Co. 1898); *see also* Tex. Const. art. VII, § 1 cmt. (stating in the editors' notes that "beginning with the school law of 1884 . . . , Texas made slow but steady progress toward the fulfillment of the constitutional goal of an 'efficient system of public free schools'"); *A.H. Andrews & Co. v. Curtis*, 2 Tex. Civ. App. 678, 679 (1893) (referencing "the school law of 1884").

with acreage of whole surveys and the approximate acreage of parts of surveys in each district."[12] The law provided that the county commissioners courts "shall designate said school districts by numbers" and that the school districts "shall not be changed without the consent of a majority of the legal voters in all districts affected by such change."[13]

In 1901, the Denton County Commissioners Court found that its school districts' boundaries were "vague and uncertain" and that the metes and bounds of the county's school districts should be "defined with certainty":

> It appear[s] to the court that the boundaries of the several school districts . . . of the County[] are vague and uncertain and that it is necessary that they should be defined with certainty[.] And it further appear[s] that the field notes and description of the several school districts as prepared by [W.H.] Pierce from the Minutes of the Commissioners Court are correct and should be placed of record in the Minutes of this Court.[] It is therefore ordered by the Court that the boundaries of the several school districts be and the same are hereby corrected . . . .

The order then described the metes and bounds of 91 school districts, including Roanoke Common School District No. 59, Elizabeth Common School District No.

---

[12]Act of Feb. 4, 1884, 18th Leg., 1st C.S., ch. 25, § 30, 1884 Tex. Gen. Laws 38, 44, *reprinted in* 9 H.P.N. Gammel, *The Laws of Texas 1822–1897*, at 576 (Austin, Gammel Book Co. 1898).

[13]Act of Feb. 4, 1884, 18th Leg., 1st C.S., ch. 25, § 29, 1884 Tex. Gen. Laws 38, 43–44, *reprinted in* 9 H.P.N. Gammel, *The Laws of Texas 1822–1897*, at 575–76 (Austin, Gammel Book Co. 1898).

58, Walnut Grove Common School District No. 73,[14] Helm No. 83 (later consolidated with several other schools to form Justin Rural High School District), and Rock Hill No. 90. Each metes-and-bounds description references the Denton County line.

In July 1909, the Denton County Commissioners Court approved the election and incorporation of the Roanoke Independent School District. The order of the commissioners court contains a metes-and-bounds descriptor that places the school district's southern boundary on the White line and includes a sketch map of the Roanoke ISD that denotes that the south line of Denton County is the White line.[15]

In 1910, the Tarrant County Commissioners Court laid out the metes and bounds of 93 school districts. Of these school districts, Henrietta No. 4 (which was later consolidated with Roanoke) and Avondale No. 90 (which was later consolidated with Haslet Common School District No. 97) became part of Northwest.

Also included among the 93 school districts was Lonesome Dove No. 7. That district, which was sometimes referred to as Dove District No. 7, had the following in its metes-and-bounds description: "Thence West with Denton County line to S. E.

_____

[14]Roanoke, Elizabeth, and Walnut Grove were later consolidated to form Roanoke ISD.

[15]Carroll notes that the sketch map does not identify any line on the map as "the Denton County Line." But as set forth below, Northwest's expert Gilley testified that "[y]ou can clearly tell from this sketch that the line that they show to be what is referred to as the county line," and he explained that the county line on the sketch was in the vicinity of the White line.

14

Corner of F. L. Harris Survey." In 1917, Lonesome Dove No. 7 was consolidated with several other districts to form Carroll Common School District No. 99.

In 1915, the Tarrant County Commissioners Court laid out the metes and bounds of Common School District No. 97 (also referred to as Haslet Common School District No. 97). Its metes-and-bounds description began at "the northeast corner of the Avondale District No. 90, on a point on the north line of Tarrant County."

In 1947, Elizabeth Common School District No. 58, Walnut Grove Common School District No. 73, and Roanoke Rural High Common School District were consolidated with Roanoke ISD.

In 1949, the commissioners courts of Tarrant, Denton, and Wise Counties— following elections ordered by these courts upon presentment of petitions signed by the requisite voters—created Northwest. The January 1949 order of the commissioners courts consolidated Rhome ISD, Justin Rural High School District, Haslet Common School District No. 97, and Roanoke ISD and included the following as part of its metes-and-bounds description of Northwest: "BEGINNING at the Southeast corner of [W]ise County, same being the South[]west corner of Denton County and on the North Boundary line of Tarrant County." It later states "THENCE South to *the County Line* between Denton and Tarrant Counties." [Emphasis added.] Between those two calls are references to land encompassed by the descriptions of the various predecessor school districts:

15

THENCE Up the channel of said West Fork to the Southeast corner of 1900 acres of land that was transferred from the Rhome School District to the Boyd School District November 30, 1948[,] as shown of record in Vol 4 Page 262 of the Minutes of the County School Board of Wise County, Texas[,] SAME BEING A POINT in the Geo. L. Bledsoe Survey;

. . . .

THENCE East to the Southwest corner of a 55[-]acre tract in said T & PR R Co. Survey that was transferred from the Fairview School District to the Rhome School District September 7, 1948[,] as shown of record in Vol[.] 4 page 258 of the Minutes of the County School Board of Wise County, Texas;

. . . .

THENCE East along the county line between Tarrant and Wise Counties to the Southwest corner of Denton County being the place of beginning, containing a total of 126,082 acres of land more or less, calculated to be 197 square miles, being a consolidat[]ion of all the lands comprising the school districts known prior to this consolidation as the Justin Rural High School District in Denton County, [t]he Roanoke Independent School District in Denton and Tarrant Counties, the Haslet Common School District in Denton and Tarrant Counties and the Rhome Independent School District in Wise County, all of said counties being in the State of Texas, the number of acres from each of said school districts as follows[:]

| School District | Acres |
|---|---|
| JUSTIN | 45, 222. |
| ROANOKE | 27,091. |
| HASLET | 35,411. |
| RHOME | 18,358. |
| | 126,082  TOTAL ACRES |

16

The February 1949[16] order consolidated Fairview School District No. 39 with Northwest. That order included the following as part of its metes-and-bounds description of Northwest: "BEGINNING at the Southeast corner of Wise County, same being the Southwest Corner of Denton County and on the North Boundary line of Tarrant County," and "THENCE South to *the County Line* between Denton and Tarrant Counties[.]" [Emphasis added.]

Shortly after the creation of Northwest, from 1949 to 1951 the Texas Legislature passed various validation statutes pertaining to school districts.[17] The statutes specifically state that "[t]he boundary lines of any and all such school districts are hereby in all things validated."[18]

In 1959, some of the inhabitants of Carroll Common School District No. 99 filed a petition to incorporate the school district. On March 4, 1959, the County Judge of Tarrant County ordered an election after finding that the petition was signed by the requisite number of inhabitants of the school district and that the petition

---

[16]The January 1949 order and the February 1949 order are referenced jointly throughout the remainder of the opinion as the 1949 orders.

[17]Various sections of the Texas Revised Civil Statutes, not session laws, were admitted into evidence. *See* Tex. Rev. Civ. Stat. Ann. art. 2815g–39, § 1 (enacted in 1949 to validate all school districts in large counties), art. 2815g–40, § 1 (enacted in 1949 to validate the consolidation of independent school districts with other districts), art. 2742*o*, § 1 (enacted in 1949 to validate common school districts), art. 2815g–43, § 1 (enacted in 1950 to validate all school districts), art. 2815g–46, § 1 (enacted in 1951 to validate all school districts).

[18]*See id.* arts. 2815g–39, § 1, 2742*o*, § 1, 2815g–43, § 1, 2815g–46, § 1.

17

"contain[ed] a definite description by metes and bounds of the District proposed to be incorporated." Based on the election returns, the County Judge of Tarrant County ordered that the school district be incorporated and that the name be changed from Carroll Common School District No. 99 to Carroll Independent School District. The metes-and-bounds description contained in the petition referred to a point in "the North line of Tarrant County."

Shortly after Carroll was created, the Texas Legislature passed more validation statutes in 1959 and 1961.[19] Like the prior validation statutes, these state that "[t]he boundary lines of any and all such school districts are hereby in all things validated."[20]

Thus, by 1961, both school districts had been created, and the boundary lines had been validated.

### b. Surveys and Retracements of the County Line

The view of where the county line between Tarrant and Denton Counties lies on the ground has evolved over 150 years. In 1852, the Texas Legislature passed "An Act better defining the boundaries of Denton County" that provided a metes-and-

---

[19] *See* Act of Feb. 17, 1961, 57th Leg., R.S., ch. 9, §§ 1–6, 1961 Tex. Gen. Laws, 15, 15–18; Act of May 7, 1959, 56th Leg., R.S., ch. 348, §§ 1–5, 1959 Tex. Gen. Laws 767, 767–70.

[20] Act of Feb. 17, 1961, 57th Leg., R.S., ch. 9, § 1, 1961 Tex. Gen. Laws, 15–17; Act of May 7, 1959, 56th Leg., R.S., ch. 348, § 1, 1959 Tex. Gen. Laws 767–768.

bounds description of Denton County.[21]  After the Act of 1852 was passed, White

was appointed to survey and mark the south line of Denton County.  White surveyed

and marked on the ground the Denton County–Tarrant County line (which came to

be known as the White line) from December 1852 to January 1853 and filed his field

notes in the general land office (GLO).  White's field notes on file in the GLO were

the only field notes of any line purporting to be the Denton County–Tarrant County

line at the time of the commissioners courts' orders creating Northwest in 1949 and

Carroll in 1959.

The White line was accepted as Denton County's southern boundary line from

1853 until the *Tarrant County* suit.  Prior to that suit, Tarrant County had begun to

question whether the White line was a proper survey of the boundary between it and

Denton County.  The various counties impacted by the question entered into an

agreement that was designed to finally resolve the question.  This history is set forth

in the *Tarrant County* opinion as follows:

> In 1984[,] the Denton County Commissioners Court requested
> assistance from Dallas and Tarrant Counties regarding the location of
> their southern line.  That year, Denton and Dallas formed a Bi–County
> Line Commission for the purpose of determining whether sufficient
> evidence existed to ascertain on the ground the physical location of their
> legislatively mandated boundaries.  During this process, Denton and
> Dallas determined it would be necessary to bring in additional counties
> because their boundaries could be impacted also.  So, in 1986[,] Tarrant,

---

[21]Act approved Jan. 24, 1852, 4th Leg., R.S., 1852 Tex. Gen. Laws 32, 32, *reprinted in* 3 H.P.N. Gammel, *The Laws of Texas 1822–1897*, at 910, 910 (Austin, Gammel Book Co. 1898).

Denton, Dallas, and Collin Counties entered into an agreement which was an expansion of the previously created Bi–County Line Commission. The expanded agreement states that its purpose is to ascertain and locate on the ground the northern boundaries of Dallas and Tarrant Counties and the southern boundaries of Denton and Collin Counties. . . . Pursuant to the Interlocal Cooperation Agreement each of the four counties hired and retained Don Jackson of Lichliter–Jameson and Associates to perform the survey and subsequently adopted his survey.

87 S.W.3d at 166.

The surveys conducted pursuant to the Interlocal Cooperation Agreement determined that White had erred in his determination of the boundary between Tarrant and Denton Counties as follows:

Pursuant to the Interlocal Cooperation Agreement, Jackson prepared a survey and field notes locating the boundaries and corners covered by the agreements and contracts. In May 1987[,] Denton County and the other three counties approved Jackson's field notes by county court orders. Jackson determined that [Warren A.] Ferris [who had surveyed Dallas County in July 1850], and therefore White, had erroneously located Dallas County's northwest corner 2200 feet south and 1300 feet east of where it should have been, resulting in [a] jog in Dallas County's northwest corner and creating two northwest corners for Dallas County. Therefore, Jackson set Dallas County's northwest corner and Tarrant County's northeast corner at the same point and monumented that location per the Interlocal Cooperation Agreement.

*Id.* at 171.

By the time the *Tarrant County* suit was filed almost 150 years after White surveyed the county line, the original monumentation of the White line between Tarrant and Denton Counties had deteriorated due to the passage of time but could still be found on the ground. As a result, Wilson was appointed by the *Tarrant County*

January 2000 interlocutory judgment to perform a resurvey. In March 2000, Wilson stated in an affidavit that, while performing his resurvey, he had "found evidence on the ground[] . . . to confirm the location of survey corners referenced by the original, and only, on[-]the[-]ground survey of the Denton–Tarrant boundary" and that "[t]he county boundary referred to [in the hundreds of deeds that he had examined] is the historical boundary surveyed by George White in December 1852 - January 1853."

The outcome of the *Tarrant County* suit turned not on the historically recognized county line but on a boundary line correctly surveyed when the resurvey required by the Interlocal Cooperation Agreement was conducted by Jackson. *Id.* at 175. We held that "the line located by Jackson that was approved by both [Tarrant and Denton Counties] is the true boundary between these counties." *Id.* We remanded the case "to the trial court for entry of a judgment properly adopting the Jackson survey and for entry of any other orders the trial court deem[ed] appropriate related to or necessary to any resurveying and remarking of the boundary." *Id.* at 180.

On remand, the trial court in the *Tarrant County* suit appointed Gilley, a registered professional surveyor and a licensed state land surveyor, to resurvey and monument the counties' true boundary line as established by the Interlocal Cooperation Agreement and Jackson's survey. *See* Tex. Loc. Gov't Code Ann. § 72.004. In 2004, he surveyed and marked what became known as the Gilley line.

### c. Testimony Interpreting "the County Line" Descriptor

The testimony at trial here centered on what was meant by "the County Line" descriptor in the 1949 orders that created Northwest and the 1959 order that created Carroll. As explained in detail below, Carroll's experts, while agreeing with Northwest's experts on the rules that govern surveying, disagreed with Northwest's experts on the emphasis to be placed on the orders that created the predecessor school districts and opined that the county line referred to in the 1949 orders is the Gilley line that came about more than 50 years after Northwest was formed. Carroll's experts' view gave the county-line descriptor in those orders an inchoate quality that discounted the term's reference to the physical line that White had surveyed on the ground and that was the only line in existence when the boundaries of the various school districts forming Northwest and Carroll were created. Even though these predecessor school districts were given metes-and-bounds descriptions as a result of a legislative command to specifically define their boundaries and even though the 1949 commissioners court orders gave a metes-and-bounds description of Northwest, Carroll's experts viewed the term "the County Line" as referring to the actual demarcation between the jurisdictions of Tarrant and Denton Counties that floated through time and space as subsequent events clarified where that demarcation was located.

### (1) Carroll's Experts

#### (a) Surveyor James Brittain[22]

James Brittain, a registered professional land surveyor who testified as an expert for Carroll, was hired to create a map based on the Tarrant Appraisal District's electronic maps and to identify the location and definition of Carroll's district. He did not do a retracement of the metes-and-bounds descriptions that were incorporated into the 1949 or 1959 orders.

In Brittain's opinion, the descriptor of the Denton County–Tarrant County line in the 1949 orders creating Northwest at the time of the 1949 election was unknown, ambiguous, and did not exist. He held the same opinion of the 1959 order creating Carroll. Brittain opined that none of the drafters—the drafters of the field notes for the 1949 orders, the drafters of the field notes of Northwest's predecessor school districts, the drafter of the Carroll field notes, or the drafter of Carroll's predecessor school districts—had any idea where the Denton County–Tarrant County line was.

Northwest's counsel cross-examined Brittain as follows:

> [Y]ou looked at [the 1959 Carroll incorporation petition] and you found that there were about two dozen petitioners who sought to incorporate Carroll . . . , it being earlier the Common School District Number 99, and if they said there had been a definite description by metes and bounds of the Common School District . . . .
>
> . . . .

---

[22]The record spells his name Britain and Brittain on the same page. Because Brittain is the spelling used in his report, we use that spelling.

So here are people when -- from your perspective everybody knew that the Tarrant County/Denton County line did not exist, and yet these folks are writing a description that says it's definite and it goes down the county line, did that move your boat at all?

A. That may be what they believe.

Q. Okay. Well, what about the order that the Judge, the Tarrant County Judge signed that said I find that that petition is definite, the one that refers to the county line?

A. None of them have any proof of that.

Q. Well, there's an order that says he said it was definite[.]

A. Order says what?

Q. The order says that the description attached to the petition is definite and described by metes and bounds.

A. Well, the petition of 1959 said the Denton/Tarrant County line, period.

Q. Well, my question to you --

A. It never said White.

Q. So if -- let me go at it a different way.

If the county judge of Tarrant County, who is the person who lives in the county that's being adversely affected by, from your perspective, an improper county line, why would he sign an order saying that the line is definite when it referred to a line that did not exist?

A. Because he doesn't know any better.

Q. Do you have any evidence of that?

A. No.

24

Q. Okay. Well, what about after the election and the election gets passed and the Judge finds that the metes and bounds of Carroll . . . is incorporated, and the metes and bounds are definite, why wouldn't the Tarrant County Judge at that time, if he knew it didn't exist, why would he allow that to occur?

A. I don't know.

Q. Well, if everybody knew that the county line didn't exist, why would an elected official of Tarrant County whose interests were being adversely affected, or at least the interest he's supposed to represent, were being adversely affected, would allow that to occur?

A. He's a human being, and he didn't know any better.

Despite Brittain's opinion that the county line was indefinite in 1949 and 1959, he testified that the 1852–1853 White line can be found on the ground by coordinates and that Wilson's later survey definitely reconstructed the White line. Yet Brittain opined at trial that the descriptor in the 1959 order referring to the Denton County–Tarrant County line was the Gilley line. This opinion contradicted Brittain's December 2017 deposition in which he testified that the Denton County–Tarrant County line that was referred to in the 1959 field notes was not the Gilley line.

### (b) Surveyor Dr. Gary Jeffress

Dr. Gary Jeffress, a professional land surveyor who had previously testified on behalf of Tarrant County in the dispute between the counties, opined that the common boundary between Northwest and Carroll was the Gilley line, not the White line:

> The reference to the county line between Denton and Tarrant Counties, and that is in quotes, in the 1949 description does not refer to the White

25

line surveyed in 1852–53, rather it refers to a county line that was indefinite in 1949. There is no contrary evidence.

> Based on the evidence . . . in my report, if a prudent land surveyor is asked to locate the common line between Carroll Independent School District and Northwest Independent School District, the only location [that] satisfies the Texas Board of Professional Land Surveying rule on boundary reconstruction is the location of the fully monumented on-the-ground survey of Tarrant/Denton County line as surveyed by surveyor Mr. Gary Gilley based on the April 6, 2004 modified and corrected final judgment in Tarrant County versus Denton County.

According to Dr. Jeffress, the Gilley line is "the only surveyed line of Denton and Tarrant, the common boundary between Denton and Tarrant County, which satisfies all three definitions of the counties of Dallas, Tarrant, and Denton . . . as laid down by the legislature in the Acts that created and redefined those counties."

Dr. Jeffress admitted that he did not look to see what the law was on the creation of school districts and that he did not know that the Texas Legislature had required school districts to have definite boundary lines in its 1884 Act requiring the county commissioners to give school districts specific metes-and-bounds descriptions. Nor had he even looked at the legal documents creating the predecessor school districts. After being shown the metes-and-bounds description of Carroll in the 1959 order, Dr. Jeffress agreed that the order referred to a description that was definite at the time of the order, but he disagreed with the order's description and maintained that the description is indefinite. When Northwest's counsel asked Dr. Jeffress to use the Tarrant County Commissioners Court order of 1910 containing the metes-and-bounds description of Lonesome Dove Common School District No. 7 (which was

26

consolidated in 1917 with Carroll Common School District No. 99 and later into Carroll ISD) and to trace the description on the map Brittain had created, he agreed that Carroll's boundary could not be the Gilley line.

Dr. Jeffress also acknowledged that Northwest's legal description of its boundaries in the 1949 commissioners court orders is the senior description and that Carroll's description in the 1959 commissioners court order is the junior description, and in the case of a conflict, the senior tract—Northwest—would prevail. Dr. Jeffress agreed that in determining Northwest's boundaries as they existed in 1949, he, as a surveyor, could not consider documents that were prepared after that 1949 description because, to do so, he would not be following in the footsteps of the original surveyor, who would not have had access to those documents. Dr. Jeffress further agreed that the Gilley line was not surveyed, marked on the ground, or filed until 2004 and therefore could not have been considered by the 1949 drafters.

Dr. Jeffress acknowledged that White's field notes were on file with the GLO in 1901, 1910, 1947, 1949, and 1959—the dates of the commissioners court orders creating all of the predecessor school districts, Northwest, and Carroll. Dr. Jeffress agreed that the drafter who wrote the descriptions for Northwest and Carroll had notice of White's line and that the result of White's filing of his field notes with the GLO was to establish on the ground the Denton County–Tarrant County line back then. Dr. Jeffress also agreed that White's field notes were the only field notes of any line purporting to be the Denton County–Tarrant County line in 1949.

27

Yet, Dr. Jeffress opined at trial that White's field notes were not correct and that it was very unlikely that White's monuments or settings still existed in 1949. Northwest's counsel pointed out that during Dr. Jeffress's deposition, he had been asked whether monuments erode or disappear over time, and he answered, "Especially the ones that were put down by Mr. Surveyor White when he defined the White line." But Dr. Jeffress had also agreed during his deposition that there was a possibility that those monuments or settings did exist in 1949 but that he was not able to locate them 50 years later when he and Gilley went to look for them.

Dr. Jeffress testified that he did not believe that the legal descriptions in both Northwest's and Carroll's orders evidenced the intention of the commissioners courts to refer to the then-existing line on the ground. During his deposition, however, Dr. Jeffress had answered "yes" when Northwest's counsel asked if he would agree that the legal descriptions of the boundaries in Northwest's and Carroll's call notes evidenced the intention of the commissioners courts "with relation to what was known to be the existing[,] on[-]the[-]ground boundaries."

Dr. Jeffress testified at trial that as a surveyor, he had to presume that the White line located the boundary unless the reverse could be shown. Northwest's counsel then asked, "And you can't prove the reverse is true in this case, can you?" Dr. Jeffress responded, "I can prove that it does not comply with the [1852] Act." During his deposition, however, when Dr. Jeffress was asked whether he had proved that White did not locate that land, he answered, "No, I cannot prove -- cannot prove

28

the reverse." Dr. Jeffress further testified at his deposition that he had to assume that White had "made the survey where he [had] put it."

Dr. Jeffress equivocated on whether Wilson had retraced White's line. Dr. Jeffress initially agreed that Wilson had sufficiently located White's line on the ground in 2000 but then testified on redirect that it was not possible for Wilson to have located the White line in the same location as described in White's field notes and that, in his opinion, it would have been impossible to get to that exact line due to "the discrepancies that Wilson [had] found between the connections to the original surveys and his passing calls." But Dr. Jeffress ultimately testified on re-cross, re-redirect, and further re-cross that Wilson had sufficiently located White's line on the ground, that Wilson's line was sufficient for a "historic retracement of the White line," and that Wilson had located the original White line within the precision required by the Texas Board of Professional Land Surveying.

### (2) Northwest's Experts

#### (a) Garey Gilley

As mentioned above, Gilley served as Northwest's primary expert and testified over the span of two days. Because he had surveyed the Gilley line in *Tarrant County* but was testifying in defense of the White line here, he provided the lion's share of the experts' testimony in response to a wide range of questions. To accommodate the volume of Gilley's testimony, we have summarized the relevant portions and have broken down that summary into various topics. Though Gilley's testimony is

29

voluminous, the essence of his testimony was that the descriptor "the County Line" in the 1949 orders was not an inchoate description of some floating line that marked the demarcation between Tarrant and Denton Counties' jurisdiction. Rather, according to Gilley, the term was a refrence to the only line marked on the ground that existed when the boundaries of the school districts from which Northwest and Carroll were formed were defined as required by the Legislature and when the 1949 commissioners court orders described by metes and bounds the boundaries of Northwest, the new district that combined the previously described districts.

Explanation of why the Gilley line is not the common boundary and how *Tarrant County* differs

Gilley began by stating, "I'm taking the position that in 1949 the so-called Gilley line was not in existence, and so therefore cannot be considered in reconstructing the boundary of Northwest." Gilley then explained how this case differs from the *Tarrant County* case:

Q. So are your opinions that you are going to give in this case today inconsistent with the opinions and the work that you did in the Tarrant County/Denton County case?

A. No, sir.

Q. Then why is it that your testimony in the Tarrant County/Denton County case is not inconsistent or contradictory with the testimony and reports and affidavits you have given in this case?

A. Well, to try to say it in my terms, . . . the two cases that we're working on or the situations that we have, first [*Tarrant County v. Denton County*], that was a case that had to decide where was the true boundary

30

line between Tarrant and Denton County, and it had many, many factors that had to be considered.

. . . And the Court had to sort all of that out, and the Court was asked to determine where was the true line between the two counties.

In this case, even though we keep referring to a county line, it's really not about the county line. It is about a line that is described in a description, described in a certain piece of real estate that is referred to as the county line, but the question is what line was it that was referred to as the county line.

The county line really has nothing to do with that description, so there are two separate cases, and they're quite frankly to me they're apples and oranges[;] they don't even intermingle with each other.

Gilley's examination of the 1949 orders and the orders creating the predecessor school districts

Gilley testified that he was hired in this case to opine regarding whether the boundary description for Northwest was sufficient and contained enough information to enable a competent surveyor, using ordinary survey means and methods, to locate that description and mark it on the ground with reasonable certainty. Gilley explained the process that he had used in forming his opinion:

Well, again, the way you approach any land surveying issue, the first thing, of course, that I looked at was the order in 1949, the document [that] created Northwest Independent School District.

And there [were] two or three things within that document. First of all, the document told me that Northwest was being formed as a consolidation of existing school districts[,] and then that document went on and gave a written description of the limits of the school district.

And the description that is contained within that document is primarily what we would refer to as a bounds description. In other words, it describes various boundaries which make up the whole[.]

Gilley testified that the 1949 orders' descriptor that refers to the county line between Denton County and Tarrant County is not ambiguous. He explained that "a bounds description cannot be ambiguous from the standpoint you are calling it for the boundaries, and so whatever it calls for, that description is going to follow that call adjoiner. So the fact that it doesn't have any calls for course or distance pretty well eliminates any ambiguities." In other words, according to Gilley, because the boundary description is meant to describe a line in existence, it cannot be ambiguous.

Gilley testified that the work he did in this case constituted a boundary retracement. Gilley testified that it was "very necessary" in a boundary retracement analysis to review the field notes of Justin Rural High School, Roanoke ISD, Haslet Common School District No. 97, and Rhome ISD and their predecessors to determine the location of the descriptor referring to the Denton County–Tarrant County line in the 1949 orders. Gilley said that the 1959 order incorporating Carroll Common School District No. 99 into Carroll ISD very clearly stated that the north line of Carroll is the south line of Northwest. He explained that this was important to him because his proper retracing of the limits of Northwest automatically located the north line of Carroll due to the order's wording clearly stating that Carroll's north line is the south line of Northwest, the senior school district. Gilley said that Northwest was not the senior school district simply because it was created earlier than Carroll but

because the Carroll order specifically referenced Northwest's existing boundary line.

Gilley explained that field notes played an important role in his retracement analysis:

> When I looked at the order for Northwest ISD, within that order and in the bounds description, . . . there [was] more than one occasion that the call in the description is [a] call[] to go to the county line. It doesn't give me a distance to travel. It just says from wherever point I might be at the time, I go either north o[r] south until I reach the county line.
>
> Now, that description was written in 1949, so I have to put myself in place in 1949. So it was very easy in 1949, what was the county line. So a very quick review of the records that, of course we have done previously, but we did it again, was . . . that the only line that had purported to have been surveyed, marked on the ground, and his field notes were written and placed in a file in Tarrant County/Denton County and the general land office was the line that was surveyed by Surveyor George White in 1852 or 1853.
>
> So . . . sitting in the chair of the descriptors in 1949, it told me that was the line that they would call for, that was the county line. But I also felt like that that would be kind of a leap of faith, it would be a quick assumption.
>
> Was there some way that I could go back in the chain of evidence, and the chain of evidence would be the descriptions that were utilized in the original creation or in the creation of the original school districts, so that took me back to the 1901 court order by the Denton County commissioners where they defined all of their school districts, and it later took me to the 1910 court order by Tarrant County, when they defined their school districts.
>
> So by reviewing those descriptions, I found evidence that clearly pointed to the line that was called for in the Northwest description was the county line as surveyed by George White.

Gilley said that he gave great weight to the descriptors in the orders creating the predecessor school districts. Gilley disagreed with Dr. Jeffress's statement that there was no need to consider the earlier documents because they have no bearing on

33

the call to the county line. Gilley explained that the earlier documents are part of a chain of evidence and that completing a boundary retracement is like putting together a 500-piece jigsaw puzzle in which every piece has to fit, so "sometimes you have to go over here to these earlier descriptions and piece together part of it." Gilley said that is imperative to go back to look at the foundation of the description to see what it was based on. But Gilley did not consider anything that occurred after 1949 because "whoever prepared that description [of Northwest] totally would have been unaware of it."

Gilley locates the White line on the ground and determines that it syncs with the metes-and-bounds descriptions of the predecessor school districts

Gilley testified that he had been able to find the White line on the ground "within surveying rules, principles[,] and guidelines."[23] Gilley reiterated that the line called for in the 1949 orders creating Northwest is the line that was surveyed and marked on the ground by White.

Gilley testified that during his boundary retracement, he found evidence in the records that supports his opinion that locates the descriptor at the Denton County–Tarrant County line in the 1949 consolidation order. Gilley looked at 17.5 miles of the Denton County–Tarrant County line, including between Carroll and Northwest,

---

[23]Gilley testified that because he could locate the White line with reasonable certainty, he had no reason to look at the taxing line. Gilley further explained that because the taxing line referred to by the parties only came into existence in 1981 when the Tarrant Appraisal District was formed, "it's hard to draw any conclusions as to whether or not the 1949 description was referring to the taxing line."

and he found five points along the White line that he believed were supported by the documents.[24] Using the descriptions of the early school districts (Haslet, Roanoke, and Walnut Grove) from the Denton County Commissioners Court's 1901 order, Gilley explained how those descriptions point to the White line as describing a line on the ground that marked the county line between Denton County and Tarrant County under the 1949 order:

> Well, just quickly, reiterate the common corner, the southwest corner of Denton County where the two lines are together. There is a connection in the Haslet ISD at the Greenberry Overton survey, there's a connection to the T&P survey, and there's a connection from the McDonald survey all going to what they call the county line.
>
> And then when we get over to the Roanoke ISD orders, the -- they call again at the corner of the previous school district, which puts them together at that point.
>
> And then here at the -- at Roanoke, it calls to be at the southeast corner of District Number 58, which places it at the northwest corner at this point, and we'll come back up to this a little bit.
>
> But in the description of this school district it clearly points out that the southwest corner of this school district is the southwest corner of a particular land grant at this location.
>
> And then coming on to the east, the -- all three of these school districts are all clearly within Denton County, so they all come to the county line and do not extend over into Tarrant County.
>
> And then all the way in through Walnut Grove, which is [the] east part of Northwest. And what's significant about Walnut Grove is where

---

[24]Gilley explained that only two points are necessary to attain reasonable certainty about the location of a line.

they are in common with . . . Northwest ISD.  The language is exactly the same in both descriptions.[25]

Gilley interpreted the 1901 order[26] "to say that all the previous descriptions have discrepancies, and we are correcting those descriptions with these descriptions." Gilley then concluded, "And so unless I find evidence to the contrary, I would look upon these descriptions as the original or give them the same value as the original." Moreover, Gilley explained that the 1901 order's field notes make reference to a land area:

> [E]ach of these descriptions, after they describe the particular piece of real estate they're describing, either at the beginning or the end of the description, states how many acres are embraced within that description.
>
> School District Number 1 containing 12,844.35 acres of land. You cannot determine a land area that is embraced within a description without having a closed boundary.  So either these descriptions have got to form some type of a closed boundary, whether that's closed mathematically or closed by plotting or any other features[;] there can't be one leg left off, i[f] you will.  It's got to be completely enclosed. Otherwise, you cannot compute a land area.

Gilley agreed that the field notes for each of the three school districts—Elizabeth, Walnut Grove, and Roanoke—show up in the 1949 orders that created

---

[25]Gilley testified that he also found more evidence in a private land transaction in which W.F. Anderson sold two tracts of land to the United States for construction of Lake Grapevine.  Because one tract was solely within Denton County and the other tract was solely within Tarrant County, Gilley concluded that "the common line between these properties ha[s] got to be the county line, . . . as they recognized it to be."  However, this land transaction occurred ten or eleven months *after* the 1949 Northwest election to consolidate.

[26]Gilley read aloud the relevant portion of the 1901 order, which is set forth above in Section II.C.2.a. that describes the creation of the school districts.

Northwest. Gilley further agreed that the field notes that extend the Walnut Grove school district to the Denton County line do the same in the 1949 orders. Gilley explained that this field notes' repetition shows "consistency from the original creation of the school districts up to the consolidation." Later in his testimony, Gilley testified that "every one of these descriptions that call for the county line are calling for the same line."

Gilley testified that the 1909 order creating Roanoke ISD had a sketch attached to it that included the original land grants. Gilley explained the significance of one of the land grants, the R.M. Sneed land grant:

> [Y]ou can clearly tell from this sketch that the line that they show to be what is referred to as the county line, appears to be traversing along the south line of the R. M. Sneed survey, and of course the Sneed [survey] is the original land grant, which can [be] and has been located on the ground.

Gilley explained that the Denton County line on the sketch is in the vicinity of the White line. Gilley said that the sketch was done in 1887 by Surveyor Biggerstaff, who was the county surveyor for Denton County, and that "[t]hese are his field notes." Gilley explained that on Biggerstaff's sketch, "he's showing what he has referenced as the line between Denton and Tarrant Counties, and that's indicated on that dashed line." Gilley testified that in 1887, Biggerstaff wrote a letter, in which "he would have been addressing this to the record," and certified that

> the above plat is a true representation of the survey shown thereon, as [] found . . . by actual measurements on the ground.

The dotted line represents the line between Denton and Tarrant Counties, and is the north boundary line of section number one, MEP&P Railroad Company survey in Tarrant County, and calls for a distance of 924 varas.

. . . The distance of 924 varas on its north boundary line from the west boundary line of the Cuella and east boundary line of the Perry Section 95, and what he goes on to say is he actually measured 930 varas, and he talks about that difference in measurement.

So in this letter, [Biggerstaff] is, again, certifying . . . the county line.

When asked whether Biggerstaff's map shows that the line between Denton County and Tarrant County is indefinite, Gilley answered, "No, sir."

With regard to the metes-and-bounds description creating Haslet Common School District No. 97, Gilley testified that the metes-and-bounds description contains three calls that were "definitely certain coming to the Wilson line."[27]  Gilley testified that the calls did not go anywhere near the Gilley line.

With regard to Lonesome Dove No. 7 (which became part of Carroll), Gilley took the field notes, plotted them, drew a configuration, and followed them. According to Gilley, this process provided him with significant insight into the location of the county line:

[T]his one is the first time we have [an] absolute definite location for the county line in relation to the original land grants.  These descriptions were written, and what is significant in this one to me is if you follow this description down to here, and I'll start reading at this point:  Thence

---

[27]Gilley testified that he used the Wilson line and the White line as interchangeable.

38

east to the southeast corner of the Whitman survey, which is southeast corner of the Whitman survey is right here. Thence north to Denton County line. So thence north and it says to go until you get to the county line and then stop.

Gilley explained that the Lonesome Dove field notes did not give a distance call but that it gave him "the next best thing[] because the next call says thence west with the Denton County line to the southeast corner of the F. L. Harris survey." Gilley further explained that "the southeast corner of the F. L. Harris survey can only be one place. And once you've located the southeast corner of the Harris survey, you've located the county line that is called for in this description."[28] Gilley said that call provided enough certainty for him to place the county-line reference on the Wilson line.

<u>Gilley rebuts and criticizes Brittain's statements</u>

Gilley rebutted the conclusion in Brittain's expert report that "the county boundary between Tarrant and Denton County was not sufficiently definite until [he] fully monumented his survey of the Tarrant and Denton County line in 2004–2005." Gilley disagreed that the line was previously not sufficiently definite; he said that it could be plotted using White's field notes:

[I]f you take the George White field notes, you can actually plot those field notes very easily[] because George White gives references to

---

[28]Regarding his references to corners, Gilley testified,

[T]hose were corners which I have determined the location of based on a combination of on-the-ground surveying and record research. And so . . . when I get a call that identifies that survey corner as being on a county line, I know where that survey corner is, because I have established it on the ground.

original survey corners[;] and . . . then towards the west end, he gives reference bearings back to Blue Mound, and he gives three bearings to Blue Mound.

And by plotting those three bearings from the distance apart that he calls them to be, and you put those on Blue Mound, that puts the line where it should be on the map. So to my way of thinking, the line was sufficiently described.

Brittain's expert report also included the following statement with which Gilley disagreed:

[T]he only location of the common line between Carroll ISD and Northwest ISD, which satisfies the Texas Board of Professional Land Survey Rules on boundary and construction is the fully monumented on-the-ground survey of the Tarrant /Denton County line as surveyed by Garey Gilley based upon the April 6, 2004 modified and corrected final judgment in *Tarrant County v. Denton County*.

Gilley rebutted that statement by explaining that the rules of the Board were not adopted until 1980, so he did not know what that would have to do with the line that was surveyed in 1852–1853 by White. Gilley further stated that the rules had no applicability in 1949.

Gilley rebuts and criticizes Dr. Jeffress's opinion

Gilley also rebutted Dr. Jeffress's expert report and his testimony. In Dr. Jeffress's "Report on the common boundary line between Carroll ISD and Northwest ISD," he stated that

the one and only adjudicated and recognized original survey of the county line between Tarrant and Denton County in compliance with their statutory definitions, was surveyed and monumented on the ground by Mr. Surveyor Garey Gilley on April 6, 2004 modified and corrected

40

final judgment, in [C]ause Number 44051 *Tarrant County v. Denton County*, 43rd District Court in Parker County.

Gilley rebutted this statement, explaining that it posed the same issue as Brittain's statement above in that Dr. Jeffress was trying to apply rules that were not in place in 1949.

In his report, Dr. Jeffress also referenced Wilson's work as an "attempted retracement of the White" line. Gilley took issue with Dr. Jeffress's categorization of Wilson's work as merely an "attempted retracement" of the White line, noting that "[t]he Wilson survey was certainly a retracement of the White line."

Gilley also disagreed with Dr. Jeffress's conclusion that the White line cannot be the line referred to in the 1949 order and stated, "I think it can be the only line referred to in the '49 order."

Gilley also took issue with the statement in Dr. Jeffress's report that the location of the White line was never marked on the ground. Gilley explained that he had found evidence to the contrary:

> There is actually no evidence whatsoever to indicate that the George White line was never marked on the ground. In fact, we have a lot of evidence confirming that it was marked on the ground.
>
> And also [we're talking] about descriptions that were prepared in 1949. I have no way of knowing, nor does anybody in this courtroom have any way of knowing what was in place in 1949.
>
> The George White monuments could have very well still been there. We know they were not there in [1997–1998 when] Dr. Jeffress and I [were] out there on the ground together[] because we looked and we never found any, but we don't know that they [weren't] there the

41

week before. We just know they weren't there when we looked for them.

Gilley explained that when a surveyor certifies that he has set or marked corners, other surveyors are to assume that those statements are true without evidence to the contrary. Gilley said that "if Surveyor White said that he [had] built those earth mounds and [had] placed a flat rock on top of them, we are to assume that he built those earth mounds and put a rock on top of them until we have evidence otherwise. And we have seen no evidence that would indicate that he did not do that." Gilley agreed that Dr. Jeffress's statement—that when they were searching for the original monument set during the 1997–1998 time frame, they found no marks set by White—was basically true. But Gilley noted that Dr. Jeffress had failed to mention that Gilley had pointed out several monuments that marked corners that were referenced in White's field notes. Gilley clarified, "We just didn't find any of the mile posts or mounds that w[ere] established by White."

With regard to the statement in Dr. Jeffress's report—that "had the County Commissioners, in 1949, recognized the White line as the Tarrant/Denton [C]ounty line[,] they could have described the line 'as established by Mr. Surveyor George White in 1853'"—Gilley explained that "we don't know what was in the minds of the commissioners, why they did or did not call for the George White line. They called for the county line. And in 1949, the only county line of record was the George White line."

Gilley agreed with Dr. Jeffress's statement that "land surveyors are required to place themselves as nearly as possible in the seats which were occupied by the parties at the time an instrument was executed" and further specified that they had to put themselves "in the seats of the describers in 1949."

Gilley also disagreed with Dr. Jeffress's testimony in which he concluded that "[t]he reference to the county line between Denton and Tarrant Counties in the 1949 description does not refer to the White line surveyed in 1852 or 1853, so it refers to a county line that was indefinite in 1949[;] there is no contrary evidence." Gilley explained that it was true that the line between Denton and Tarrant County in the 1949 orders did not specifically refer to the White line, nor did it specifically refer to the Gilley line (which was not yet in existence). Gilley stated that there was evidence contrary to the notion that the line was indefinite, as indicated by the predecessor school districts' descriptions.

Gilley further disagreed with Dr. Jeffress's conclusion that because only White's field notes were on file at the time that the school districts were formed, the common boundary was the Gilley line as determined by the 2004 modified and corrected final judgment in the *Tarrant County* case:

> [I]f a prudent land surveyor were asked to locate the common line between Carroll ISD and Northwest ISD at any time prior to 2004, that same prudent land surveyor would locate the line along the only line which purported to be the county line at that time, which had been surveyed and monumented on the ground in 1852, and which the surveyor's field notes by George White were on file.

So any time prior to 2004 if you were asked to locate that line, the only set of field notes that were on file and on record was the [set of field notes by] George White.

Gilley Rebuts Defense's Rebuttal Witness

During Gilley's testimony, he responded to various statements contained in the second rebuttal report prepared by surveyor Kenneth George Gold who served as Carroll's rebuttal expert. Because Gold did not testify during Carroll's case in chief, Gilley read portions of Gold's report aloud for the record and then responded to what he had read.

- Gilley criticized the following passage in Gold's report:

Having been on the ground and viewed selected portions of the W. C. Wilson alleged retracement of the Geo. White survey of 1852–3 and various witness reports, one thing is most clear to me as a surveyor, the districts' locative boundary descriptions are flawed, incomplete[,] and most likely ambiguous. However, with that said, they have made their *intention* clear; their boundaries abut their specifically called-for county line.

Gilley took exception to Gold's referring to the Wilson retracement as an "alleged retracement" because Gilley believed that Wilson did retrace it. With regard to Gold's statement that the boundary descriptions "are flawed, incomplete[,] and most likely ambiguous," Gilley noted that Gold did not "give a single piece of evidence as to what he [had] based that conclusion on." Gilley concluded that the descriptions were not flawed, incomplete, or ambiguous because they contained sufficient information to be located on the ground.

44

- Gilley took issue with the following hypothetical question that Gold posed in his second rebuttal report: "[H]ow long could an <u>unmaintained</u>, minimally marked survey line remain *recognizable* in the wind[-]blown, rain[-]washed, scorching, freezing North Texas weather?" Gilley observed that "once again Surveyor Gold only asks a hypothetical question as rebuttal. He offer[ed] no evidence that the marked and visible boundary was not as the writers describe it to be."

- Gilley agreed with Gold's statement that metes-and-bounds descriptions should form a closed mathematical or plottable figure, but Gilley noted that Gold did not explain how the school districts' descriptions did not form a closed mathematical or plottable figure when several, if not all, of the descriptions recited a land area within the district to be formed. Gilley further explained that the land area within the description could not have been determined if the scriveners did not have either a mathematical or a plottable figure.

- Gilley disagreed with the following statement that Gold made in his second rebuttal report:

  Therefore, there remains the problem of [Northwest's] clinging to its boundary description, claiming to a *county line boundary* that never was permanently marked, maintained, apparent, official, <u>or</u> a *recognized county line* (via *Tarrant Co. v Denton Co.*, 87 S.W.3d 159, 166 (Tex. App.—Fort Worth 2002).

45

Gilley explained that Gold had failed to provide any evidence that the Denton County–Tarrant County line dividing the school districts was never permanently marked, maintained, apparent, official, or recognized.

- Gold went on to state that the location of the White line had "long-become indefinite." Gilley pointed out that Gold's statement was made without any foundation as to when or how the line had become indefinite.

- Gold stated that Gilley, in his August 25, 2017 report, had acknowledged mistakes in the school districts' descriptions "but seem[ed] to minimize, if not ignore their effect." Gilley refuted Gold's conclusion that a silent record was indicative of a "mistake":

  [Gold] somehow implies that the absence of the dimensions are somehow a mistake. I don't recognize those as mistakes within the description. I think they were intentionally left off to eliminate any possibility of ambiguity, so my only comment is the fact that I don't acknowledge that there are mistakes in those descriptions.

- Gold's rebuttal report also questioned Gilley's reliance on a call to the county line in the F.L. Harris survey:

  Another concern is that in his last paragraph Mr. Gilley seems to believe that by calling for the closing course to the county line ". . . *thence west with Denton County line to SE corner of F. L. Harris survey.*" He goes on to say, "This call clearly places the south line of Denton County at the southeast corner of the F. L. Harris Survey."

  *Perhaps* this may be a clue to the county line[']s location, but the credibility of one deed scrivener hardly warrants such trust.

Gilley interpreted Gold's statement as referencing the call in the Lonesome Dove's field notes that said to go along the county line to the southeast corner of the F. L. Harris survey. Gilley responded to Gold's observation by noting that Gold had downplayed the importance of that call when he made reference to this being a call of one scrivener. Gilley explained, "It's not a matter of a call of one scrivener[;] that's what the record indicates. The record of those field notes indicate that the county line is at the southeast corner of the F. L. Harris survey." Gilley reiterated that in the absence of evidence to the contrary, the surveyors were to assume that any statement made by a surveyor was a true statement.

- Gold was concerned that White's field notes that were on file with the GLO were copies made by the County Clerk without notation of any known GLO acceptance or why only a copy was submitted with no comments regarding the unusual circumstance. Gilley explained that most documents on file with the GLO are certified to be exact copies of the originals and that White's field notes on file with the GLO are certified to be exact copies. Gilley explained that the only difference between White's field notes and Gilley's field notes that were on file for the *Tarrant County* case was how the copies were made; in 1852, those copies were made by handwritten transcription while in 2004, the field notes were scanned or copied by machine.

47

- Gold's report further stated that Gilley had failed to resolve the problems inherent in the school districts' descriptions and had ignored that they could be resolved by the Gilley line:

  Of the many meticulous detailed explanations, examples, history[,] and supports regarding the badly flawed ISD descriptions, Mr. Gilley has offered nothing *resolving* the core problem of the description-courses that are missing bearings and/or distance calls. However, when the solution is now offered right before our eyes by an adjudicated, marked county line[], Mr. Gilley continues [to] hope to resurrect the long-lost line by insisting, with time and financial support, the 1852–3 Geo. White survey can be restored.

  Gilley first responded that his role as a surveyor was not to seek a solution to a problem but to determine what the facts are; he said that others take those facts and try to reach a solution to the problem. Gilley further responded that he had no hope of resurrecting the White line and did not need for it to be surveyed because that line had been retraced and resurveyed by Wilson.

Carroll's cross-examination of Gilley

Most of the questions during Carroll's cross-examination of Gilley were geared toward having Gilley agree that there was uncertainty over where the "true county line" was located from the 1800s forward. Gilley acknowledged that there was some uncertainty with regard to the location of the true county line but repeatedly distinguished the true county line—the boundary between the *counties*—from the *school districts'* common boundary that was described as the county line in the 1949 orders creating Northwest. Gilley explained, "I don't think the White line was ever the true

and proper line separating Denton [County] from Tarrant County." That did not, however, change Gilley's opinion that the White line was the school districts' common boundary:

> I think the record indicates that it's clear as to what county line was being referred to in the school district descriptions[;] even though it may not have been a true, proper, or legal or whatever county line, I think the record of the descriptions of the early school districts clearly indicate that it was at or near the George White line.

Gilley reiterated his opinion that the White line formed the school districts' common boundary:

> [A]s a land surveyor, I believe there is sufficient evidence to indicate that the school district line as described in the 1949 orders where it referred to [the] county line is the George White line. So my opinion as a surveyor is that the true line between the two school districts is the county line that was surveyed by George White.

Gilley said that in reaching his opinion, he was not inferring the intent of the people who wrote the 1949 order. Instead, he had interpreted their intent from the field notes, the document that created the Haslet Common School District No. 97 (which later became a part of Northwest), the document and its accompanying sketch that created Roanoke ISD (which later became part of Northwest), and the field notes and description of Lonesome Dove (which later became partially incorporated into Carroll). Gilley said that all of those documents contain what he considered "absolutely sufficient evidence to indicate that the county line as referred to in those descriptions is the George White line." Gilley explained that even though the descriptions make reference to "the County Line," as a surveyor who was trying to

49

interpret those descriptions in order to place them on the ground, he had to understand and determine what line the description referred to as the county line. He had to look at what the wording of the document intended based on history. That history included

> the 1949 commissioner[]s court order that clearly says they were creating Northwest, [and that] consolidated previously existing school districts. Since that document referred to the previously created school districts, that gave me the green light, if you will, to go look at how those school districts were created, because, again, it's just like everything else, when you make reference to a previous document, you incorporate all terms and conditions in that document into your document.
>
> So when I go back in history, back in the chain of evidence is when I find a more definitive definition of a county line in the Haslet and Roanoke and Lonesome Dove descriptions.

Gilley reiterated that the history he had examined had brought him back to the White line:

> [T]he documents indicate that the school district line should be located along the George White line, which he had surveyed and purported to be the county line, even though we can argue whether or not it was the true line or not, but . . . it was the only set of field notes, the only surveyed line that was on the ground in 1949 that purported to be the county line.

Gilley said that he did not have to be clairvoyant to know what the commissioners courts intended because the earlier descriptions of the school districts "very clearly indicate that the line they w[ere] making reference to was the George White line." Gilley said that historic boundaries "very seldom" identify a boundary by name, such as the White line. Gilley explained that in "looking back at many old descriptions[,] when you see a call that says, 'Thence to the county line,' in that document, the

50

document is expressing there was only one county line, and that it was clear to the whole world as to what the intent of the document would be."

Redirect examination

On redirect, Gilley explained that the description of the school districts is in a category known as "descriptions prepared for political subdivisions, where [the surveyor was] writing a description that embraces a large area such as . . . a school district line." Gilley said that those descriptions very often do not include any distances but instead "might call to go west to the east line of Highway 35W, north along the east line of 35W, to the south line of Heritage Parkway, and east along the south line." Gilley testified that the descriptions are written that way because that description can be located on the ground, if necessary,

> but it's not practical to do a survey on the ground in order to write that description. So I take it that is what is happening in these school districts where the people who are drafting these . . . descriptions, are drafting them without the benefit of an on-the-ground survey, and they're clearly making a call that cannot be ambiguous to any other call.

Gilley reiterated that in interpreting Northwest's metes-and-bounds description, he could not consider anything that had occurred after the date of the documents in 1949. However, he could and did review documents that preceded the 1949 documents that were within the chain of evidence, which led him to conclude that what was referred to as the county line in the school districts' boundaries was the White line. Gilley testified that he was "more convinced than ever that when these

51

descriptions call to go to the county line, they were calling to go to the George White line."

### (b) Carr Ben Thomson

Carr Ben Thomson, a land surveyor and engineer who worked at the GLO during the *Tarrant County* case, testified that the only county line that was located on the ground in 1949 and 1959 was the White line and that White's field notes were on file at the GLO. Thomson agreed that the White line was marked on the ground originally and that the original marks have disappeared, but said that there were two points that he could use to ascertain with reasonable certainty the location of the White line. Thomson also agreed that Wilson, who had used the ties to still-existing properties and natural monuments, had probably recreated very closely the position of the White line on the ground.

Thomson reviewed the expert reports submitted by Brittain and Dr. Jeffress and then wrote a report rebutting them. Thomson took issue with the statement in Dr. Jeffress's expert report that the White line was never marked on the ground. Thomson believed that the line had at one point been marked on the ground because (1) White said that it had been, and (2) other surveyors had used White's corners. Thomson disagreed with the following statement in Brittain's expert report: "Therefore, the only location of the common line between Carroll ISD and Northwest ISD [that] satisfies the Texas Board of Professional Land Surveying rule on boundary construction is the fully monumented on-the-ground survey of the

Tarrant/Denton County line as surveyed by Garey Gilley based on the April 6th, 2004 modified and corrected final judgment in [the *Tarrant County* case]." Thomson explained that (1) the rules that Brittain referenced were not in effect in 1949 or in 1959 and (2) he could not look at documents—like the 2004 judgment—that were not in existence in 1949 or 1959.[29]

Thomson gave his opinion on the school districts' common boundary, explaining that because the only county line that had been marked on the ground and recognized by the general public was the White line, it was the only county line that could have been referred to in the order creating Northwest: "[T]herefore, I think that it is the line between the two school districts, the George White line."

### (3) Carroll's Rebuttal Expert - Gold

Gold testified as Carroll's rebuttal expert and critiqued White's field notes and his survey. Gold found it interesting that the county clerk had not only copied White's field notes but had also certified that they were true copies of his notes even

---

[29]Thomson provided an example of how the interpretation of the boundary description could change if present-day information were used instead of information available at the time the description was made. When asked about the portion of the Carroll description that mentions that the border is along Highway 121, Thomson testified that no portion of Highway 121 touches Carroll's boundaries today according to the "Texas School District Locator" map that Carroll admitted into evidence. Thomson explained that today Highway 121 is not located in the same place where it was located in 1959 when Carroll's field notes were written; instead, Highway 121 is about three miles further east. Thomson said that if he were given these field notes in 1959 and asked to trace Carroll's boundaries, he would go to the location of Highway 121 as it "was called to be in 1959 because that is where it was, and that's what the description calls for."

though it appeared to Gold that some of the things on White's field notes had not been written by White. Gold said that many surveyors were concerned about White's beginning point. Gold said that White had been instructed to start at the W.A. Ferris northwest corner and that this was contrary to what the legislature had prescribed, which was to begin at the northwest corner of Dallas County. Gold opined that, as a result, White was in error from the very beginning of his survey. Gold further contended that White's notes failed to indicate that he had found, uncovered, or discovered any of the three witness trees and the stake that Ferris had described in his survey. Gold explained,

> So when he called for the start at the Ferris corner, I suspect he might have been referring to Ferris'[s] stake at the northwest corner, but he totally ignored the other witness trees to prove up, and then headed west directly into one of the marked witness trees, a four-inch hackberry that he had to do something to go around, but it was not mentioned at all in the White field notes.

Gold testified that there were several unexplained mistakes in White's field notes. Gold said that White's "measurements, per se, were relatively inaccurate, but that may have been due to any number of reasons that W.C. Wilson's retracement showed these inaccuracies and had to be adjusted between creeks and other elements along the line."

Gold also criticized Biggerstaff's field notes. Gold said that when Biggerstaff followed White's on-the-ground survey and arrived at the 30th mile on the westerly line, he found that there was an extra mile.

54

Gold also discussed the descriptions of the prior school districts that were consolidated to form Northwest and found fault with them.  Gold opined that the "THENCE to the County Line" description was merely repeated by scriveners:

> Those early descriptions called for thence to the county line, which was very, very close, whether it was the legislated county line, which had never been marked on the ground, or the George White line.  That perpetuation of description seemed to become the habit.  One description writes substantially the same thing as the former description when it comes to the county line, thence to the county line, thence to the county line, and it perpetuates itself going east.
>
> So I am concerned that what the actual scriveners did know at that time was nothing more than copying what had gone before them.  They did call for the marked survey corners, the mapped survey corners, but they totally ignored any distance and sometimes bearings to the county line.

Gold opined that Carroll's northern boundary in 1959 was indefinite and that the scriveners from both school districts, when calling for the county line between Denton and Tarrant Counties, called for an adjoining and unmarked line about which they factually seemed to know nothing.  Gold also opined that the voters of Northwest and the voters of Carroll voted on and passed an ambiguous description and that the ambiguity was patent.  As stated above and rebutted by Gilley, Gold concluded that Carroll's locative boundary descriptions were flawed, incomplete, and most likely ambiguous.

On cross-examination, Gold agreed with the concept that a description like Carroll's is presumed to be made with reference to the conditions and state of premises at that time and that no subsequent change will invalidate or alter it.  Gold

admitted that he did not find enough evidence to rebut the presumption that White had taken the actions that he had set forth in his field notes. Gold agreed that, even though it may have been located erroneously, the White line was the only line available as the county boundary between Tarrant and Denton Counties between 1853 and 2004. Gold also agreed that Wilson did a competent job retracing the White line.

Gold acknowledged that the footsteps of the original surveyor must be followed and that a surveyor must look at the facts and circumstances that existed at the time the description was made. Gold agreed that "any time you are looking at a boundary problem[,] extrinsic evidence is welcome." Gold admitted that he knew that Northwest was created by consolidating existing school districts but that he did not look at the legal documents that created the predecessor school districts. Gold said that it was appropriate to go back to 1901 to the creation of the predecessor school districts for Northwest.

Gold also agreed to the following:

- Northwest's description was prepared in 1949, and to interpret that description, a person must put himself in the position of the drafters of that description in 1949.

- If a call was made earlier than 1949, then a person needed to put himself in the position of when that earlier call was made.

56

- In 1949, the drafters of Northwest's description had only one set of field notes that were available to them that purported to identify the Tarrant and Denton County line on the ground, and that was White's field notes that were on file with the GLO.

- The descriptor for Northwest does not purport to establish the county line; it merely goes to the county line.

Gold further agreed that during his deposition when asked what he would do if he had been handed Northwest's call notes and asked to put the county line on the ground in 1969 (a random date prior to the 1986 interlocal agreement between the counties that was at issue in the *Tarrant County* suit), he responded, "Retrace the White line."

### d.  Outcome

After hearing the testimony above, the trial court signed a judgment denying Carroll's request for a declaratory judgment that the Gilley line is what the commissioners court referenced in the 1949 orders, granting Northwest's request for a declaratory judgment that the disputed territory is in Northwest and that the school districts' common boundary line is the White line, and awarding Northwest attorneys' fees. The trial court made 109 findings of fact and 41 conclusions of law.[30] Carroll then perfected this appeal.

---

[30]The findings of fact and conclusions of law are attached as Exhibit A.

**III. "The County Line," as Used in the Orders Creating the School Districts, Was a Descriptor Referencing the White Line.**

In its first issue,[31] Carroll argues that "the County Line" descriptor in the 1949 orders unambiguously[32] means that the school districts' common boundary is the actual county line as defined by the legislature and later located on the ground by Gilley, not the White line. Carroll relies on the Act of 1852 that "better defin[ed]" Denton County's southern boundary as beginning at the northwest corner of Dallas County "as [then] established by law."[33] Carroll then argues that the county line established by that Act but then incorrectly identified until it was later surveyed by Gilley as a result of the *Tarrant County* suit is what was meant by "the County Line in the 1949 and 1959 orders. Carroll's argument fails because it turns on the premise that the orders' use of the descriptor "the County Line" is a reference to the actual

---

[31]Within the first Roman numeral in the argument section of Carroll's brief, Carroll lists 22 findings of fact (8–18, 22, 28, 34–36, 67, 75–76, 85, 94, 96) and 6 conclusions of law (4 and 17–21) as corresponding to various arguments that it makes in its first through third issues. The findings of fact that Carroll lists that appear to correspond to its first issue are as follows: 8–18, 28, 34–36, 67, 75–76, and 96. Carroll, however, does not specifically mention the majority of these findings in its arguments. Our analysis will focus on the findings that are necessary to the disposition of this appeal.

[32]Although Carroll contends that the term "the County Line" is unambiguous, and therefore must be construed as a matter of law, it nevertheless challenges the sufficiency of fact findings supporting the trial court's conclusions.

[33]Act approved Jan. 24, 1852, 4th Leg., R.S., 1852 Tex. Gen. Laws 32, 32, *reprinted in* 3 H.P.N. Gammel, *The Laws of Texas 1822–1897*, at 910, 910 (Austin, Gammel Book Co. 1898).

demarcation between the jurisdictions of Tarrant and Denton Counties that was not finally determined until 2004 despite probative evidence that "the County Line" was a descriptor of the line marked on the ground by White in 1852–1853, that the White line was used to describe the boundaries when the Legislature commanded that existing school districts be given definite boundaries, and that those defined school districts were later combined to form Northwest and Carroll.

## A. Standard of Review

In a bench trial, the trial court, as the factfinder, weighs the evidence and judges a witness's credibility and may accept or reject any witness's testimony in whole or in part. *Sister Initiative, LLC v. Broughton Maint. Ass'n, Inc.*, No. 02-19-00102-CV, 2020 WL 726785, at *5 (Tex. App.—Fort Worth Feb. 13, 2020, pet. denied) (mem. op.) (citations omitted). The same is true when there is a battle of the experts, as there was here; it is the sole obligation of the factfinder to determine credibility and weigh testimony, particularly opinion evidence. *See Morrell v. Finke*, 184 S.W.3d 257, 282 (Tex. App.—Fort Worth 2005, pet. denied).

A trial court's findings of fact have the same force and dignity as a jury's answers to jury questions. *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991). As with jury findings, a trial court's fact-findings on disputed issues are not conclusive, and when the appellate record contains a reporter's record, an appellant may challenge those findings for evidentiary sufficiency. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994); *Super Ventures, Inc. v. Chaudhry*, 501 S.W.3d 121, 126

(Tex. App.—Fort Worth 2016, no pet.). We review the sufficiency of the evidence supporting challenged findings using the same standards that we apply to jury findings. *Catalina*, 881 S.W.2d at 297.

We may sustain a legal-sufficiency challenge—that is, a no-evidence challenge—only when (1) the record bears no evidence of a vital fact, (2) the rules of law or of evidence bar the court from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of a vital fact. *Shields v. Ltd. P'ship v. Bradberry*, 526 S.W.3d 471, 480 (Tex. 2017); *see also Ford Motor Co. v. Castillo*, 444 S.W.3d 616, 620 (Tex. 2014) (op. on reh'g); *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998) (op. on reh'g). In determining whether legally sufficient evidence supports the finding under review, we must consider evidence favorable to the finding if a reasonable factfinder could and must disregard contrary evidence unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005). We indulge "every reasonable inference deducible from the evidence" in support of the challenged finding. *Gunn v. McCoy*, 554 S.W.3d 645, 658 (Tex. 2018).

Anything more than a scintilla of evidence is legally sufficient to support a finding. *Cont'l Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 450 (Tex. 1996); *Leitch v. Hornsby*, 935 S.W.2d 114, 118 (Tex. 1996); *see also 4Front Engineered Sol., Inc. v. Rosales*,

60

505 S.W.3d 905, 909 (Tex. 2016) ("The evidence is legally sufficient if . . . there is more than a scintilla of evidence on which a reasonable juror could find the fact to be true."). Scintilla means a spark or a trace. *Scintilla*, Black's Law Dictionary (11th ed. 2019). More than a scintilla exists if the evidence rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Rocor Int'l, Inc. v. Nat'l Union Fire Ins.*, 77 S.W.3d 253, 262 (Tex. 2002); *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997). On the other hand, when the evidence offered to prove a vital fact is so weak that it creates no more than a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003); *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983).[34]

---

[34]Carroll does not specify in its brief whether it is challenging the legal or factual sufficiency of the trial court's findings of fact. The only mention of the standard of review is the following statement: "Like *Tarrant County v. Denton County*, this is an appeal from a bench trial[,] and the standard of review is the same." We have previously stated that when an appellant does not specify whether it is challenging the legal or factual sufficiency of the trial court's findings and states only that "[t]he vast majority of the Court's Findings of Fact are not supported by the evidence," we would review the trial court's findings of fact for only legal sufficiency. *See Wells Fargo Bank, N.A v. Blackburn*, No. 02-10-00166-CV, 2011 WL 346951, at *5 n.10 (Tex. App.—Fort Worth Feb. 3, 2011, no pet.) (mem. op.); *see also Seelbach v. Clubb*, 7 S.W.3d 749, 764 (Tex. App.—Texarkana 1999, pet. denied) (interpreting appellant's challenge—that finding of fact was "contrary to the evidence as a matter of law"—as solely a legal-sufficiency challenge). Because Carroll occasionally uses the phrases "no evidence" and "contrary to law" when challenging various findings of fact and because Carroll does not seek a new trial but asks us only to reverse and render, we therefore review the challenged findings of fact solely for legal sufficiency.

Conclusions of law may not be challenged for sufficiency but are reviewed to determine their correctness based upon the facts. *Rischon Dev. Corp. v. City of Keller*, 242 S.W.3d 161, 166 (Tex. App.—Fort Worth 2007, pet. denied).

## B.     The Law on Boundary Disputes

In a boundary dispute, "the rules of evidence are more liberal than those governing other actions." *Reynolds v. Bradford*, 233 S.W.2d 464, 465 (Tex. App.—Fort Worth 1950, no writ). "[A]ncient maps and plats, long and publicly recognized, with reference to which it may be presumed that the parties and the general public have acted, are usually admissible in evidence to show the location of boundaries." *Id.* at 466.

The testimony of a surveyor is also admissible in a suit to resolve a boundary dispute. *See Craddock v. Humble Oil & Ref. Co.*, 234 S.W.2d 137, 143 (Tex. App.—Fort Worth 1950, writ ref'd n.r.e.). A surveyor may testify as to the lines that he ran on the ground and the observations that he made while making the survey. *See Floyd v. Day*, 50 S.W.2d 371, 372 (Tex. App.—Eastland 1932, writ dism'd w.o.j.) ("These explanations by the respective surveyors as to how they reached the rocks claimed by them respectively as the beginning point . . . were admissible and proper under the facts of this case[.]").

A surveyor may also testify about another surveyor's lines on the ground. A boundary determination is guided by the footsteps of the original surveyor and involves a question of fact:

The question of where boundaries are on the ground is a question of fact to be determined from the evidence. *Silver Oil & Gas, Inc. v. EOG Res., Inc.*, 246 S.W.3d 197, 202–03 (Tex. App.—San Antonio 2007, no pet.). . . . "When finding the lines of a survey, the cardinal rule is that the footsteps of the original surveyor, if they can be ascertained, should be followed." *Id.* at 204. "If the actual lines and corners run by the original surveyor can be found, they are controlling, even if they are inconsistent with the calls and references in that surveyor's field notes." *Id.* "When one can locate on the ground with certainty and without inconsistency the objects or monuments designated by the original surveyor as marking the lines he actually traced, the survey must be laid out from those points." *Id.*

*B & P Dev., LLC v. Knighthawk, LLC, Series G*, No. 04-15-00575-CV, 2017 WL 1161227, at *3 (Tex. App.—San Antonio Mar. 29, 2017, pet. denied) (mem. op.); *see also King Ranch, Inc. v. Garcia*, No. 04-13-00605-CV, 2014 WL 4627592, at *2 (Tex. App.—San Antonio Sept. 17, 2014, pet. denied) (mem. op. on reh'g) (same); *Scates v. Crawford*, No. 12-12-00380-CV, 2014 WL 1308629, at *3 (Tex. App.—Tyler Mar. 31, 2014, no pet.) (mem. op.) (same). Moreover, a presumption exists that surveyors have surveyed and marked all lines to the corners when their work has been accepted by the GLO:

> Surveyors are presumed to have performed their official duties and to have actually surveyed and marked all the lines to the corners. *See State v. Sullivan*, 127 Tex. 525, 92 S.W.2d 228, 232 (1936) (stating that a surveyor is presumed to have done his official duties); *E*[.] *Tex. Pulp & Paper Co.* [*v. Cox*], 381 S.W.2d [78,] 84 [(Tex. App.—Beaumont 1964, writ ref'd n.r.e.)] (stating that absent proof to the contrary, it is presumed the original surveyor performed his duties, including marking the lines). This is particularly true after their work has been accepted by the GLO. *See State v. Sun Oil Co.*, 114 S.W.2d 936, 945–46 (Tex. [] App.—Austin 1938, writ ref'd) (stating that after an extended lapse of time, and issuance of a patent, the county surveyor should be presumed to have properly discharged his official duties).

*TH Invs., Inc. v. Kirby Inland Marine, L.P.*, 218 S.W.3d 173, 206 (Tex. App.—Houston [14th Dist.] 2007, pet. denied). "Unless later surveyors can, by following the original surveyor['s] footsteps show that the original surveyor's calls are a mistake and incorrect, the survey must be constructed as called for by the original surveyor." *King Ranch*, 2014 WL 4627592, at *3.

"The law in Texas is clear that in locating disputed boundary lines, priority must be given to the calls of the original grant [that] are more specific and definite in preference to those merely general and indefinite." *Seelbach*, 7 S.W.3d at 764 (footnotes omitted).

## C. Legally Sufficient Evidence Supports the Trial Court's Findings Supporting its Conclusion that "the County Line" Descriptor in the School Districts' Orders Is a Reference to the White Line.

### 1. The Scope of the Evidence that We May Consider

At the outset of its argument, Carroll sets forth various alternatives for how to categorize the 1949 and 1959 orders that created Northwest and Carroll—as legislative acts, administrative acts, judicial acts, or deeds—but then argues that no matter which category is chosen, we must give the phrase "the County Line" its plain meaning as used within the four corners of the orders. Carroll states that the plain meaning of "county line" is the "boundary between two counties," but Carroll then looks to the Act of 1852, in which the legislature defined Denton County's boundaries, in order to interpret the term "the County Line" as used in the orders

creating Northwest and Carroll. Despite arguing that only the plain language in the orders' four corners can be used to interpret "the County Line," Carroll's reference to the Act of 1852, as well as its reliance on the *Tarrant County* case that established the Gilley line as the counties' common boundary, reveals its dependence on the internal context of the use of the words and the circumstances surrounding their use to reach its proffered outcome.

We have previously stated that the "commissioners courts' orders [at issue here] fall generally within the [DJA's] phrase of 'other writings constituting a contract.'" *Carroll II*, 441 S.W.3d at 690. When a contract's meaning is disputed, our primary objective is to ascertain and give effect to the parties' intent as expressed in the instrument. *See URI, Inc. v. Kleberg Cty.*, 543 S.W.3d 755, 763 (Tex. 2018). In determining the intent as expressed in an instrument, the Texas Supreme Court has made clear that we may interpret a word's meaning by looking to the internal context within a document and the circumstances existing when the document was created (so long as those circumstances are not used to contradict the word's meaning):

> "[W]ords are simply implements of communication, and imperfect ones at that. Oftentimes they cannot be assigned a rigid meaning, inherent in themselves. Rather, their meaning turns upon use, adaptation[,] and context as they are employed to fit various and varying situations." Even a single word can carry subtle—and significant—differences in meaning when applied to different situations.
>
> Accordingly, to home in on the meaning the parties intended, we have long allowed that words must be construed in the context in which they are used. Context is not, however, confined to the two-dimensional contractual environs in which the words exist but may also encompass

"the circumstances present when the contract was entered." This is so because words are "the skin of a living thought," and our quest is to determine, objectively, what an ordinary person using those words under the circumstances in which they are used would understand them to mean.

. . . Consideration of surrounding circumstances is limited by the parol evidence rule, which prohibits a party to an integrated written contract from presenting extrinsic evidence "for the purpose of creating an ambiguity or to give the contract a meaning different from that which its language imports."

. . . .

The parol evidence rule does not, however, prohibit courts from considering extrinsic evidence of the facts and circumstances surrounding the contract's execution as "an aid in the construction of the contract's language," but the evidence may only "give the words of a contract a meaning consistent with that to which they are reasonably susceptible, *i.e.*, to 'interpret' contractual terms." . . .

. . . .

Mindful of our responsibility "to honor the parties' agreement" without altering it, we have thus made a clear distinction between extrinsic evidence that illuminates contract language and extrinsic evidence that adds to, alters, or contradicts the contract's text. We recently added lucidity on this topic in *First Bank v. Brumitt*[, 519 S.W.3d 95 (Tex. 2017)]. Analogizing to the statutory-construction context, we explained what it means to consult "'evidence' of 'attending circumstances'" to "aid in the construction of [a] contract's language" without running afoul of the parol evidence rule:

> In the same way that dictionary definitions, other statutes, and court decisions may inform the common, ordinary meaning of a statute's unambiguous language, circumstances surrounding the formation of a contract may inform the meaning of a contract's unambiguous language. But courts may not rely on evidence of surrounding circumstances to make the language say what it unambiguously does not say.

*Id.* at 764–65, 767 (footnotes omitted). Additionally,

> even though a written contract be unambiguous on its face, parol evidence is admissible for the purpose of applying the contract to the subject with which it deals . . . . It merely permits proof of the then[-]existing circumstances, in order to enable the court to apply the language used therein to the facts as they then existed.

*EOG Res., Inc. v. Wagner & Brown, Ltd.*, 202 S.W.3d 338, 344 (Tex. App.—Corpus Christi–Edinburg 2006, pet. denied). Moreover, "[t]he parol evidence rule applies only to contractual or jural writings evidencing the creation, modification, termination[,] or securing of a particular right or obligation. The rule does not apply to mere statements or recitals of past facts." *West v. Quintanilla*, 573 S.W.3d 237, 248 (Tex. 2019) (citing *Gannon v. Baker*, 818 S.W.2d 754, 755–56 (Tex. 1991)).

## 2. The Particular Evidence that We May Consider

Relying on the guidance provided by the case law cited above, we may consider the contextual evidence provided within the 1949 orders, as well as contextual evidence of the circumstances present when the orders were signed. *See URI, Inc.*, 543 S.W.3d at 764. With regard to the latter—the parol evidence that we may consider—we limit our consideration to evidence of then-existing circumstances and the surrounding circumstances that informed the meaning of the term "the County Line" in the 1949 orders. Those circumstances were represented in various documents that were created both before and after 1949.

67

The record, however, reflects that Dr. Jeffress and Gilley agreed that in determining Northwest's boundaries as they existed in 1949, they could not consider documents that were prepared after 1949 because to do so would not be following in the footsteps of the original surveyor who would not have had access to those documents. And Gold agreed that in order to interpret Northwest's description, a person must put himself in the position of the drafters of that description in 1949. Moreover, Dr. Jeffress and Gilley also agreed that the Gilley line that was surveyed in 2004 could not be considered by the 1949 drafters. We therefore focus on the documents that were available to the drafters of the 1949 orders. *See Fletcher v. Ely*, 53 S.W.2d 817, 818 (Tex. App.—Amarillo 1932, writ ref'd) (using cardinal rule of construction of instruments—that the intent of the parties is the dominant ruling factor and that the instruments should be construed in light of the circumstances surrounding the parties at the time of their making—and holding that it was proper to consider the state highway referred to in the commissioners court's order "as it existed on the ground at the time of the aforesaid election"). Applying these parameters to the record focuses our review on the orders creating the predecessor school districts and the survey of the White line—all of which existed and were available to the drafters of the 1949 orders creating Northwest—and on the testimony from Northwest's experts because they were the only experts who relied on these pieces of evidence in forming their opinions.

**3.     Why the Descriptor "the County Line" Is a Reference to the White Line**

Considering evidence favorable to the findings if a reasonable factfinder could and disregarding contrary evidence unless a reasonable factfinder could not, we conclude that more than a scintilla of evidence supports the trial court's findings of fact determining that "the County Line" descriptor in the 1949 orders is the White line, as explained below.

In this battle of the experts, we note that Carroll has not challenged on appeal the qualifications or the reliability of the opinions provided by Northwest's experts, nor has Carroll challenged the ability of Northwest's experts to use their surveying skills to interpret the metes-and-bounds description in the 1949 orders. At the outset of Gilley's testimony, he refuted Carroll's faulty premise that "the County Line" descriptor in the 1949 orders is a reference to the true county line—a demarcation that separates two counties or political subdivisions. In distinguishing the true county line from the line at issue here, Gilley explained that "even though we keep referring to a county line, it's really not about the [true] county line. It is about a line that is described in a description." In essence, Gilley testified that "the County Line" descriptor in the 1949 orders served as shorthand for a line on the ground that described a call that closed the southern boundary of Denton County and the northern boundary of Tarrant County. And that shorthand descriptor was

"consisten[t] from the original creation of the school districts up to the consolidation."

As set forth above in the section describing the creation of the predecessor school districts, the Denton County Commissioners Court gave metes-and-bounds descriptions to Roanoke Common School District No. 59, Elizabeth Common School District No. 58, Walnut Grove Common School District No. 73,[35] Helm No. 83 (later consolidated with several other schools to form Justin Rural High School District), and Avondale No. 90 (later consolidated with Haslet No. 97), and each of those school districts' metes-and-bounds descriptions contained a call to the Denton County line. When Haslet School District No. 97 was formed, its metes-and-bounds description stated that the area begins at "the Northeast corner of the Avondale District No. 90, a point in the North line of Tarrant County and the South line of Denton County."

Those metes-and-bounds descriptions were carried forward in the January 1949 commissioners court order that combined Justin Rural High School District, Roanoke Independent School District, and Haslet Common School District No. 97 to form Northwest and referenced the Denton County–Tarrant County line:

> BE IT ORDERED, ADJUDGED[,] AND DECREED BY THE COMMISSIONERS[] COURT OF DENTON COUNTY, TEXAS:

---

[35]As previously stated, Roanoke, Elizabeth, and Walnut Grove were later consolidated to form Roanoke ISD.

1.  That said elections were duly called; that notice was given in accordance with law and in accordance with the order given by the County Judge calling [the] elections; that the elections were held in accordance with law[;] [and] that due return[s] of said elections have been made by the proper officers.

2.  That the votes cast in Justin Rural High School District, and the votes cast in R[oa]noke Independent School District show a majority voting in favor of consolidation of said districts herein mentioned.

3.  That Haslet[] Common School District No. 97 of Tarrant and Denton Counties, Rhome Independent School District of Wise County, Roanoke Independent School District of Denton and Tarrant Counties[,] and Justin Rural School District of Denton County are hereby declared to be consolidated and shall hereafter be known as "North West Independent School District."

Said consolidated Northwest Independe[nt] School District **being described by metes and bounds** as follows[,] to wit[:]

BEGINNING at the Southeast corner of [W]ise County, same being the South[]west corner of Denton County and on the North Boundary line of Tarrant County, a point [with]in the Matthew Ashton Survey;

THENCE North along the County line between Wise and Denton Counties to a point in the Thomas Peoples survey that is due east of the most southerly southeast corner of the Smith County School Land survey; [Single-spaced metes-and-bounds descriptions like the ones above continue for two pages.]

. . . .

*THENCE South to the County Line between Denton and Tarrant Counties*;

. . . .

THENCE East along the county line between Tarrant and Wise Counties to the Southwest corner of Denton County being the place of

71

beginning, containing a total of 126,082 acres of land more or less[.] [Emphasis added in bold and in italics.]

Similarly, the February 1949 commissioners court order that consolidated Fairview Common School District with Northwest referenced the county line in the same way:

BE IT ORDERED, ADJUDGED[,] AND DECREED BY THE COMMISSIONERS[] COURT OF DENTON COUNTY, TEXAS:

1.   That said election was duly called; that notice was given in accordance with law and in accordance with the order given by the County Judge calling the election; that the election was held in accordance with law; that due return of said election has been made by the proper officers.

2.   That the votes cast in North West Independent School District show a majority voting in favor of consolidation of said district herein mentioned.

3.   That North West Independent School District of Denton, Wise, and Tarrant Counties and Fairview Common School District No. 39 of Wise County are hereby declared to be consolidated and shall hereafter be known as North West Independent School District.

Said consolidated North West Independent School District **being described by metes and bounds** as follows, to wit:

BEGINNING at the Southeast corner of Wise County, same being the Southwest Corner of Denton County and on the North Boundary line of Tarrant County, a point within the Matthew Ashton Survey;

THENCE North along the County Line between Wise and Denton Counties to a point in the Thomas Peoples survey that is due East of the most Southerly southeast corner of the Smith County School Land Survey; [Single-spaced metes-and-bounds descriptions like the ones above continue for three pages.]

. . . .

72

> *THENCE South to the County Line between Denton and Tarrant Counties;*
>
> . . . .
>
> THENCE East along the County line between Tarrant and Wise Counties to the Southwest corner of Denton County being the place of beginning, containing a total of 136,322 acres of land, more or less[.] [Emphasis added in bold and italics.]

It is apparent from the context of the 1949 orders that the Denton County Commissioners Court was referring to a specific line on the ground. The language the orders used carried forward the component school districts' definite boundaries that the Texas Legislature had commanded that they be given. To view this language as referring to a line that would not be located for another half century (or to anticipate that the line could someday move if it had been surveyed incorrectly) is completely at odds with the orders' self-apparent purpose of defining the existing boundaries of the newly created Northwest school district.

As noted by Gilley, and as can be seen in the wording of the orders, the drafters of the 1949 orders specifically listed the school districts that were consolidated to form Northwest. Gilley opined that the descriptions of Northwest's predecessor school districts were reliable because any prior discrepancies had been removed in 1901 when the Denton County Commissioners Court described the metes and bounds of the county's school districts so that they would be "defined with certainty." And "every one of these descriptions [in the orders creating the predecessor school districts] that call for the county line are calling for the same line."

73

Using the metes-and-bounds descriptions of several of the predecessor school districts that were consolidated to form Northwest, as well as the acreage listed for those districts, Gilley concluded that the calls to "the County Line" went to the White line. Gilley's identification of the boundary line for Northwest automatically located the boundary line for Carroll because Carroll is the junior description and because the south boundary line of Northwest is the north boundary line of Carroll. Gilley thus used proper surveying rules to interpret "the County Line" descriptor in the 1949 orders. And his testimony demonstrates that "the County Line" descriptor was not indefinite or ambiguous at the time it was used in the 1949 orders. Nothing in the record shows that Gilley's testimony was incorrect.

In addition to Gilley's testimony connecting the county-line references in the predecessor school districts' orders to the White line, Carroll's rebuttal expert Gold agreed that the Northwest description does not purport to *establish* the county line but *merely goes to* the county line. Gold agreed that if he had been asked to put the county line on the ground as it existed at the time that Northwest and Carroll were created, he would have retraced the White line.

Moreover, with regard to the White line, the evidence demonstrates that White had surveyed the county line in December 1852–January 1853 and that his field notes were on file with the GLO from 1901–1959 when the predecessor school districts, Northwest, and Carroll were created. Even if the White line may have been located erroneously for purposes of locating the actual boundary line between the counties,

74

the evidence showed that the White line was the only line purporting to be the Denton County–Tarrant County line in 1949 and that the drafters who wrote the descriptions for these school districts had notice that the White line purportedly established the county line on the ground. Gilley testified that he had found evidence on the ground to confirm the location of the survey corners referenced by White. *See B & P Dev.*, 2017 WL 1161227, at *3 ("If the actual lines and corners run by the original surveyor can be found, they are controlling[.]" (quoting *Silver Oil & Gas*, 246 S.W.3d at 202–03)); *TH Invs., Inc.*, 218 S.W.3d at 206 (holding that no evidence indicated that the line that surveyor Boyles found was not Trott's line where Boyles stated that he was able to find Trott's line). And all the experts agreed that Wilson had retraced the White line and had located the White line within the precision required by the Texas Board of Professional Land Surveying. *See King Ranch*, 2014 WL 4627592, at *3. This constituted further evidence that "the County Line" descriptor in the 1949 orders was not indefinite or ambiguous.

Here, Northwest's experts were the only ones who properly followed in the footsteps of the original surveyor. The trial court accepted Northwest's experts' opinions that were based on data that was available to the 1949 drafters when they wrote "the County Line" descriptor and rejected Carroll's experts' opinions that relied solely on the outcome of a lawsuit 50 years later that involved a determination of the true county line. As the factfinder, the trial court was free to do this. *See Morrell*, 184 S.W.3d at 282; *see also King Ranch*, 2014 WL 4627592, at *1, *3 (deciding between

75

competing experts and accepting appellant's surveyors' opinions because they "more closely followed the cardinal rule to follow the footsteps of the original surveyor").

Based on the orders creating the predecessor school districts, the survey of the White line, the stated purpose of the 1949 orders to define the boundaries of Northwest by metes and bounds, as well as the testimony from Northwest's experts who properly based their opinions on that evidence that was available to the drafters of the 1949 orders, we conclude that there is more than a scintilla of evidence to support findings of fact 8–11 and 14–18 that detail how the predecessor school districts became part of Northwest and Carroll and how the references to the county line in those predecessor school districts' metes-and-bounds descriptions meant the White line. We also conclude that there is more than a scintilla of evidence to support findings of fact 28 and 36, regarding the White line's being surveyed by White and retraced by Wilson, and unchallenged finding of fact 30 that states, "As of 1959, White's field notes were the only field notes filed with the General Land Office that described the Tarrant/Denton County line." *See Seelbach*, 7 S.W.3d at 765–66 (holding evidence legally sufficient to support finding that Henry's survey was the proper legal description of a certain tract because he had used the oldest survey that he could find and had followed in the footsteps of the original survey when making his own survey); *cf. Templeton v. Dreiss*, 961 S.W.2d 645, 659–60 (Tex. App.—San Antonio 1998, pet. denied) (interpreting the interest in and to a road described in a 1933 deed by using a 1918 deed and a reference to the Linen Survey in the 1933 deed). And these 12 fact-

76

findings support conclusions of law 4 and 21 that determined that "the County Line" referenced in the 1949 orders is the White line.

We hold that legally sufficient evidence supports findings of fact 8–11, 14–18, 28, and 36 and that conclusions of law 4 and 21 are correct based on the 12 fact-findings that we have analyzed. *See URI, Inc.*, 543 S.W.3d at 765 (permitting interpretation of unambiguous language based on circumstances). Accordingly, we overrule Carroll's first issue.[36]

## D. *Tarrant County* Did Not Ascertain the School Districts' Common Boundary Line; thus, the Trial Court's Determination of the School Districts' Common Boundary Did Not "Reestablish" the County Line Contrary to *Tarrant County.*

We address Carroll's second and third issues together because they relate to whether the *Tarrant County* suit applies here and whether the White line as the county line is contrary to *Tarrant County.* In its third issue,[37] Carroll argues that the decision in

---

[36]We need not address the remaining findings of fact and conclusions of law that Carroll lists in its first issue because the trial court's judgment on Northwest's declaratory-judgment claim can be sustained on the grounds stated above. *See* Tex. R. App. P. 47.1; *Villages of Sanger, Ltd. v. Interstate 35/Chisam Rd., L.P.*, No. 05-16-00366-CV, 2018 WL 703327, at *6 (Tex. App.—Dallas Feb. 5, 2018, no pet.) (mem. op.); *SAVA Gumarska in Kemijska Industria D.D. v. Advanced Polymer Scis., Inc.*, 128 S.W.3d 304, 315–16 (Tex. App.—Dallas 2004, no pet.) (citing Rule 47.1 and declining to address sufficiency of evidence supporting findings of fact because findings rendered immaterial once conclusions of law determined to be correct on alternate basis). And based on our disposition of Carroll's first issue, we do not reach Carroll's fifth issue, which addresses Northwest's alternative theories for establishing the taxing line as the common boundary between the school districts. *See* Tex. R. App. P. 47.1.

[37]Carroll states that its third issue is responding to "FF 21, 23–25, 78, 93" and "CL 16, 23–24." Of these, only finding of fact 78 is pertinent to our analysis.

*Tarrant County* ascertained the location of both the county line and the school districts' common boundary. Carroll argues that because this court determined the physical location of the Denton County–Tarrant County line in *Tarrant County*, that determination is binding as to the school districts' boundary:

> This [c]ourt then ruled that the Denton/Tarrant County Line would run from the northwest corner of Dallas County as located by [surveyor] Jackson, to the southeast corner of Wise County. In 2005, Gilley surveyed and marked that line. Thus, the decision in *Tarrant County* "ascertain[ed] on the ground the physical location of [the counties] legislatively mandated boundaries." *Tarrant County*, 87 S.W.3d at 166.
>
> And since the school district boundary lay on the County Line, the *Tarrant County* decision, and the subsequent Gilley survey, <u>also</u> ascertained the location of <u>the school district boundary</u>. It's that simple. [Citations to sections of brief omitted.]

In its second issue, Carroll argues that the trial court "erred in 'reestablishing'" the White line as the county line contrary to *Tarrant County*. Within this argument, Carroll contends that there is no evidence to support findings of fact 22, 28, 35, 75, and 76. Of these findings, we have held above that finding of fact 28 is supported by more than a scintilla of evidence. Of the remaining findings of fact, only 75 and 76 specifically relate to the *Tarrant County* decision:

> 75. NISD was not a party to the *Tarrant County v. Denton County* lawsuit.
>
> 76. NISD did not intervene in the *Tarrant County v. Denton County* lawsuit.

We therefore focus our analysis on these two findings, finding of fact 78 that is challenged in Carroll's third issue, and two conclusions of law that Carroll ignored.

78

Carroll attempts to counter findings of fact 75 and 76 by arguing that by filing a letter with the trial court, Northwest became an intervenor in the *Tarrant County* lawsuit:

> [Northwest] intervened in *Tarrant County v. Denton County* by filing a letter in the 43rd District Court asking the judge to rule that his judgment would not affect other governmental entities who are "not parties to this suit." However, the 43rd District Court did <u>not</u> grant that request, and two weeks later, it signed the Modified and Corrected Final Judgment. By filing this letter with the 43rd District Court, [Northwest] became one of "the parties to this suit." [References to the record and to other sections of the brief omitted.]

As explained by Northwest, its letter was not a pleading. First, it could not have properly intervened in the *Tarrant County* suit because it was not a party to the Interlocal Cooperation Agreement—the validity of which was at issue in that suit. And second, its letter was dated more than six months after this court's mandate issued, making any purported intervention untimely. *See Guar. Fed. Sav. Bank v. Horseshoe Operating Co.*, 793 S.W.2d 652, 657 (Tex. 1990) (stating that an entity has the right to intervene if the intervenor could have brought the same action, or any part thereof, in its own name); *cf. Robertson v. Hix*, 383 S.W.3d 170, 174 (Tex. App.—Waco 2012, pet. denied) (holding petition in intervention untimely when it was filed one month after mandate had issued and the judgment was not set aside). We hold that there is more than a scintilla of evidence that supports the trial court's findings that Northwest was not a party to and did not intervene in the *Tarrant County* suit.

79

With regard to Carroll's challenge to finding of fact 78—that "[t]he Gilley [*l*]ine did not exist in 1949 and did not exist until 2004"—sufficient evidence supports the finding. Gilley himself testified that he surveyed and marked what became known as the Gilley line in 2004 and that the line did not exist in 1949. Dr. Jeffress also agreed that the Gilley line was not surveyed, marked on the ground, or filed until 2004. We hold that there is more than a scintilla of evidence that supports the trial court's finding that the Gilley line did not exist in 1949.

Carroll's second and third issues ignore the following conclusions of law:

27. Neither [Northwest] nor [Carroll] was a party to, nor bound by, the Interlocal Agreement nor the *Tarrant County v. Denton County* [*l*]awsuit.

28. The *Tarrant County v. Denton County* [*l*]awsuit did not rule on the boundaries of [Carroll] nor [Northwest]."

Our review of the *Tarrant County* decision demonstrates that the school districts' common boundary as referenced in the 1949 orders was not decided in that case. The issue in that case was whether Denton County was bound by the Interlocal Cooperation Agreement in which four *counties*, not school districts, sought to settle a boundary-line dispute. *Tarrant County* 87 S.W.3d at 175. *Tarrant County* therefore has no application to this case.[38] Moreover, because the *Tarrant County* decision did not

---

[38]Tarrant County filed an amicus curiae brief, arguing that the boundary of Tarrant and Denton Counties is the Gilley line; that it is not subject to being relitigated; and that "regardless of the decision the [c]ourt reaches on the school districts' boundary, it should reiterate that the boundary between Tarrant and Denton [C]ounties is the Gilley [*l*]ine." Because we hold that the *Tarrant County* suit does not apply to this case, the holding in *Tarrant County* remains intact.

establish the school districts' common boundary, the trial court in this case did not "reestablish" the county line; the trial court merely interpreted the term "the County Line," as used in the 1949 orders, as the White line. For the reasons discussed in the analysis of Carroll's first issue, more than a scintilla of evidence supports the trial court's finding that "the County Line" descriptor is the White line.

Viewing the evidence under the appropriate standard of review, we hold that more than a scintilla of evidence supports findings of fact 75, 76, and 78 and that conclusions of law 27 and 28 are correct.[39] Because the decision in *Tarrant County* did not ascertain the location of the school districts' common boundary and because the trial court did not reestablish the county line when it ruled that "the County Line" descriptor in the 1949 orders is shorthand for the White line, we overrule Carroll's second and third issues.

## E. The Finding on Northwest's Declaratory-Judgment Claim Nullified Carroll's Competing Request for a Declaratory Judgment.

In its fourth issue, Carroll argues that the trial court had jurisdiction over its declaratory-judgment claim. Carroll states that this argument responds to findings of

---

[39]We need not address the remaining findings of fact and conclusions of law that Carroll lists in its second and third issues. *See* Tex. R. App. P. 47.1; *Villages of Sanger, Ltd.*, 2018 WL 703327, at *6; *Advanced Polymer Scis.*, 128 S.W.3d at 315–16.

fact 5, 74, 89–91, 97, and 99–103 and conclusions of law 5–10, 16, 22, 25–26, and 29–30 wherein the trial court concluded that it lacked jurisdiction over this claim.[40]

Carroll pleaded for "a declaratory judgment that the common boundary between [Carroll] and [Northwest] lies along the Tarrant/Denton [C]ounty line as determined by *Tarrant County v. Denton County*" and argued that the "actions [as described in the sixth amended original petition] of the individual defendants, in their official capacities only, have been and are illegal, unauthorized[,] and *ultra vires.*"  In *Carroll III*, a majority of the justices concluded that the trial court's subject-matter jurisdiction over Carroll's current claims was not limited and held that Carroll's "claims as currently pleaded are nothing more than a request for a judicial determination regarding the location of the actual boundary between the districts."[41] *See* 502 S.W.3d at 924–25.  The trial court, however, made findings that Carroll did not contest the formation of Northwest, that Carroll's suit was an attempt to move the boundary line, that Carroll never sought to annex the disputed area, and that Carroll did not exhaust its administrative remedies with the Commissioner of Education before filing suit.  Based on these findings, the trial court concluded that Carroll's claims constituted a collateral attack on the 1959 order consolidating Carroll

---

[40]The trial court's first conclusion of law, which Carroll did not include among the conclusions that it challenges, states that "[Carroll's] claims for declaratory relief and ultra vires are denied."

[41]Carroll did not amend its claims after *Carroll III*.

and that Carroll's claims were barred because it lacked standing to collaterally attack the 1949 and 1959 election results that created Northwest and Carroll.

To the extent that the trial court determined that it lacked jurisdiction to consider Carroll's request for a declaratory judgment, the trial court erred because that determination contradicts *Carroll III*, which is law of the case. *See Briscoe v. Goodmark Corp.*, 102 S.W.3d 714, 716 (Tex. 2003) ("The 'law of the case' doctrine is defined as that principle under which questions of law decided on appeal to a court of last resort will govern the case throughout its subsequent stages."). Thus, the previously listed findings and conclusions are incorrect as a matter of law.

Because we have determined that these findings and conclusions are incorrect as a matter of law and that they cannot be sustained under any legal theory supported by the evidence, we must next determine whether these errors were reasonably calculated to cause and probably did cause the rendition of an improper judgment. *See* Tex. R. App. P. 44.1(a)(1). We hold that they did not. As explained above, the trial court had three choices for the school districts' common boundary line: the White line, the taxing line, or the Gilley line. The trial court found—and such finding is supported by more than a scintilla of evidence—that the White line is the school districts' common boundary. The trial court's White-line finding nullified Carroll's competing declaratory-judgment action requesting that the trial court find that the Gilley line, as determined by *Tarrant County*, is the common boundary. And because the White-line boundary places the disputed area within Northwest, the individual

83

defendants' actions on behalf of Northwest were not illegal, unauthorized, and ultra vires. Accordingly, we overrule Carroll's fourth issue.

## IV. Immunity and Attorneys' Fees

Before we set forth Carroll's sixth issue, which deals with whether Carroll is immune from Northwest's counterclaim for declaratory judgment and for attorneys' fees, we first set out the relevant portions of the parties' pleadings and the judgment.

Carroll's live pleading—its sixth amended petition—includes the following summary of the relief requested, including its request for a declaratory judgment on the school districts' boundary, a determination on its ultra vires claim, and an award of attorneys' fees:

> ACCORDINGLY, [Carroll] seeks a declaratory judgment that the common boundary between [Carroll] and [Northwest] lies along the Tarrant/Denton county line as determined by *Tarrant County v. Denton County*, and that the above-described actions of the individual defendants, in their official capacities only, have been and are illegal, unauthorized and *ultra vires*. [Carroll] also **prays for attorneys' fees**, costs of court, and general relief. [Emphasis added in bold.]

Northwest's first amended counterclaim seeks a declaratory judgment and an award of attorneys' fees:

> [Northwest] seeks a declaratory judgment pursuant to Chapter 37 of the Texas Civil Practice & Remedies Code declaring that the [d]isputed [t]erritory and the students residing in that territory are located, and have always been located, within the boundaries of [Northwest] and that [Northwest] has all the rights and obligations consistent with the [d]isputed [t]erritory being located within its boundaries.
>
> . . . [Northwest] also seeks its costs and reasonable and necessary *attorneys' fees* through trial and any subsequent appeals under Section

84

37.009 of the Tex. Civ. Prac. & Rem. Code. An award of such costs and fees to [Northwest] is equitable and just. [Emphasis added.]

Carroll's first amended answer to Northwest's first amended counterclaim raised several affirmative defenses, including governmental immunity, and asserted that Northwest "is responsible for paying its attorneys' fees in this action."

The trial court denied Carroll's request for a declaratory judgment; granted Northwest's request for a declaratory judgment; decreed that "the [d]isputed [t]erritory . . . and the students residing in that territory are located, and ha[ve] always been located, within the boundaries of [Northwest] and that [Northwest] has all the rights and obligations consistent with the [d]isputed [t]erritory['s] being located within its boundaries"; and included the following award of attorneys' fees in the final judgment:

> IT IS FURTHER ORDERED, ADJUDGED[,] AND DECREED that it is equitable and just under TEX. CIV. PRAC. & REM. CODE § 37.009 that [Northwest and the individual defendants] . . . be awarded their reasonable and necessary attorneys' fees and costs incurred in this matter as follows, with all attorneys' fees and costs being taxed to [Carroll]:
>
> 1. Reasonable and necessary attorneys' fees in the amount of $850,055.00 for defending this case through this judgment.
>
> 2. If [Carroll] unsuccessfully appeals this judgment to an intermediate court of appeals, [Northwest and the individual defendants] will additionally recover from [Carroll] the amount of $100,000.00, representing the anticipated reasonable and necessary attorneys' fees that would be incurred by [Northwest] in defending the appeal.
>
> 3. If [Carroll] unsuccessfully appeals, or if [Northwest and the individual defendants] successfully appeal, this judgment to the Texas

Supreme Court, [Northwest] will additionally recover from [Carroll] the amount of $75,000.00 if a petition for review is filed, $50,000.00 if the petition for review is granted and/or briefing on the merits is requested by the Texas Supreme Court, and $40,000.00 if oral argument is granted and occurs in the Texas Supreme Court. All of these amounts represent the anticipated reasonable and necessary attorneys' fees that would be incurred by [Northwest] in defending the appeal in the Texas Supreme Court.

IT IS FURTHER ORDERED, ADJUDGED[,] AND DECREED that [Northwest and the individual defendants] are entitled to recover from [Carroll] postjudgment interest on all of the above at the rate of five percent (5%), compounded annually, from the date this judgment is rendered until all amounts are paid in full.

On appeal, Carroll argues in its sixth issue that regardless of the merits of Northwest's claim, Northwest is not entitled to a declaratory judgment and cannot recover attorneys' fees and, alternatively, that the attorneys' fee award is excessive. The crux of Carroll's argument is that it is immune from suit and thus is also immune from paying Northwest's attorneys' fees.

## A. Carroll's Claim of Immunity Regarding Northwest's Declaratory-Judgment Action

Carroll argues that both it and Northwest are immune from suit under the DJA because neither side is challenging the validity of the 1949 and 1959 orders.[42] Carroll then appears to argue that in order for Northwest to be able to bring suit against Carroll, Northwest was required to bring an ultra vires action against Carroll's officials as set forth in *City of El Paso v. Heinrich*, 284 S.W.3d 366, 372–73 (Tex. 2009). Carroll

---

[42]This argument is inconsistent with Carroll's request that we render declaratory judgment in its favor.

points out that after it amended its pleadings to add an ultra vires claim, Northwest did not amend its pleadings to add its own ultra vires action against Carroll's board and superintendent. Carroll argues that because Northwest elected to proceed only against Carroll and because Carroll is immune from suit, we must dismiss Northwest's declaratory-judgment claim.

Carroll's argument misses the mark for two reasons. First, Carroll's reliance on *Heinrich* is misplaced. In *Heinrich*, the Texas Supreme Court explained that declaratory-judgment suits alleging ultra vires claims are not barred by sovereign immunity:

> [W]here statutory or constitutional provisions create an entitlement to payment, suits seeking to require state officers to comply with the law are not barred by immunity merely because they compel the state to make those payments. This rule is generally consistent with the letter and spirit of our later caselaw. In [*Tex. Natural Res. Conservation Com'n v.*] *IT–Davy*, we distinguished permissible declaratory-judgment suits against state officials "allegedly act[ing] without legal or statutory authority" from those barred by immunity: "In contrast [to suits not implicating sovereign immunity], declaratory-judgment suits against state officials seeking to establish a contract's validity, to enforce performance under a contract, or to impose contractual liabilities are suits against the State. *That is because such suits attempt to control state action by imposing liability on the State.*" 74 S.W.3d [849,] 855–56 [(Tex. 2002)] (citations omitted) (emphasis added).
>
> From this rationale, it is clear that suits to require state officials to comply with statutory or constitutional provisions are not prohibited by sovereign immunity, even if a declaration to that effect compels the payment of money. To fall within this *ultra vires* exception, a suit must not complain of a government officer's exercise of discretion, but rather must allege, and ultimately prove, that the officer acted without legal authority or failed to perform a purely ministerial act.

87

284 S.W.3d at 371–72 (citations omitted). In order for *Heinrich* to be triggered, Northwest would need to have a claim that Carroll's officers had acted without legal authority or had failed to perform a purely ministerial act. *Id.* at 372. Yet the record is replete with evidence that the disputed territory has always been treated as part of Northwest. Carroll's officials did not exert any authority over or exercise any power within the disputed territory from the time that Northwest was created; they did not tax the homes there, they did not educate the students who lived in that area, they did not hold bond elections that covered the disputed territory, etcetera. Thus, Northwest has no ultra vires claim against Carroll's officers for acting without legal authority in the disputed area, and as explained below, Northwest was not required to file an ultra vires claim against Carroll's officials in order to maintain its declaratory-judgment suit against Carroll.

Carroll's immunity argument pertaining to Northwest's declaratory-judgment claim also fails because it ignores our prior discussion of the viability of a declaratory-judgment action to decide the boundary dispute. Before Carroll filed its sixth amended petition adding the ultra vires claim, we had already concluded in *Carroll II* that "the [DJA] applies when, as here, a school district seeks to resolve a controversy regarding a judgment or order issued by a commissioners court even though the words 'judgment' and 'order' are not contained within the specific enumerations listed in the Act." 441 S.W.3d at 691. We further stated that "if the suit for declaratory relief is really just one to clarify a term incorporated into both commissioners courts'

88

agreements, and therefore the judgments and orders they both entered, then this narrow objective or request for relief is properly addressed in a declaratory[-]judgment action." *Id.* at 693.

Because Northwest had no ultra vires claim against Carroll's board and superintendent and was not required to bring an ultra vires claim in order to have a term in the commissioners courts' orders interpreted under the DJA, we overrule the portion of Carroll's sixth issue arguing that it is immune from suit on Northwest's declaratory-judgment counterclaim.

## B.    Carroll's Claim of Immunity Regarding the Award of Attorneys' Fees

With regard to the award of attorneys' fees, neither Carroll nor Northwest has provided much argument or citations to relevant authority.    Carroll's immunity argument regarding whether it is liable for the award of attorneys' fees is grounded on its immunity-from-suit argument.   At the conclusion of its *Heinrich* argument, Carroll argues in a single sentence that based on Northwest's failure to bring an ultra vires claim, we must dismiss both Northwest's declaratory-judgment counterclaim and the attorneys' fee award on the ground of governmental immunity.

The entirety of Northwest's response is as follows:

[Carroll] waived any potential immunity when, as the plaintiff, it sued [Northwest] and its trustees and superintendent under the [DJA] and affirmatively requested its attorneys' fees as relief. *City of McKinney v. Hank's Rest. Group, L.P.*, 412 S.W.3d 102, 119–20 (Tex. App.—Dallas 2013, no pet.)[,] is dispositive:

89

We turn to the City's second argument, which addresses the *Reata*[ *Constr. Corp. v. City of Dallas*, 197 S.W.3d 371 (Tex. 2006)] doctrine. Under *Reata*, a governmental entity is not immune from suit for monetary claims against it that are "germane to, connected with, and properly defensive to affirmative claims made by the entity, to the extent the claims against the entity offset the entity's claims." . . .

So the question is whether the City's claim for attorneys' fees under the [DJA], asserted in its own lawsuit against HRG, constituted an affirmative claim for relief under *Reata*. We conclude that it did.

[*See also*] *City of Dallas v. Albert*, 354 S.W.3d 368, 375 (Tex. 2011); *State v. Harper*, 562 S.W.3d 1, 15 (Tex. 2018). [Citations to the record omitted.]

In a single paragraph in its reply brief, Carroll argues that the cases cited by Northwest are distinguishable because if a city is not immune to a plaintiff's claim for monetary relief under *Reata*, it is "only to the extent that such a claim offsets the city's counterclaim for monetary relief. [197 S.W.3d] at 377." Carroll points out that it did not seek monetary relief, only a declaratory judgment against the individual defendants in their official capacities. Carroll concludes that *Reata* and its progeny are therefore not applicable in this case. We agree with Carroll that *Reata* does not apply, but we disagree that Carroll is immune from the award of attorneys' fees.

It is unclear why Northwest has attempted on appeal to categorize the competing declaratory-judgment actions and claims for attorneys' fees here as falling within the nuanced *Reata* paradigm as the sole basis for upholding the trial court's award of its attorneys' fees. As mentioned above, *Reata* and its varied progeny address governmental immunity in the context of a suit between a governmental entity and a

90

nongovernmental entity or a person when competing claims have been filed and a monetary claim has been asserted. *See* 197 S.W.3d at 375–77; *see also Harper*, 562 S.W.3d at 15; *Albert*, 354 S.W.3d at 375. That is not what we have here, as neither school district has asserted a claim for monetary relief. Instead, Northwest's counterclaim constitutes a standard declaratory-judgment action seeking construction of "the County Line" descriptor in the 1949 orders. *See* Tex. Civ. Prac. & Rem. Code Ann. § 37.004(a) ("A person interested under a . . . written contract, *or other writings constituting a contract . . .* may have determined any question of construction . . . arising under the . . . contract[] . . . and obtain a declaration of rights, status, or other legal relations thereunder.") (emphasis added). We therefore need not analyze whether Northwest can fit its square peg (a standard declaratory-judgment claim) into a round hole (the paradigm set forth in *Reata* and its progeny), and we need not delve into whether competing claims for attorneys' fees constitute an offset to fit into the scenario described in *Hank's Restaurant Group*.

Instead, the issue of the attorneys' fee award here is similar to that in *City of Alton v. City of Mission*, No. 13-08-00582-CV, 2010 WL 4018526 (Tex. App.—Corpus Christi–Edinburg Oct. 14, 2010, pet. denied) (mem. op.). In that case, two cities filed competing motions for summary judgment for a declaratory judgment concerning extraterritorial jurisdiction, and the trial court granted summary judgment and awarded attorneys' fees in favor of Mission. *Id.* at *1 (citing Tex. Civ. Prac. & Rem. Code Ann. § 37.009). The judgment was affirmed on appeal, and the Texas Supreme

91

Court denied review. *Id.* (citing *City of Alton v. City of Mission*, 164 S.W.3d 861, 864, 870 (Tex. App.—Corpus Christi–Edinburg 2005, pet. denied)). Mission then filed a petition for writ of mandamus with the trial court requesting that the trial court direct Alton to pay the $60,000 judgment awarding attorneys' fees to Mission. *Id.* The trial court granted Mission's petition for writ of mandamus, and Alton appealed. *Id.*

On appeal, Alton argued that it had not agreed to pay attorneys' fees in the underlying action and "therefore, there was no implicit waiver of governmental immunity for involuntary payment of attorneys' fees arising out of the [d]eclaratory[-][j]udgment action." *Id.* The Corpus Christi–Edinburg Court of Appeals set forth the law on governmental immunity and then explained that it was upholding the award of attorneys' fees against Alton because the underlying action was not a suit for money damages and was thus not barred by governmental immunity:

> "Governmental immunity, like the doctrine of sovereign immunity to which it is appurtenant, involves two issues: whether the State has consented to suit and whether the State has accepted liability." [*Harris Cty. Hosp. Dist. v. Tomball Reg'l Hosp.*, 283 S.W.3d 838, 842 (Tex. 2009) (citing *Wichita Falls State Hosp. v. Taylor*, 106 S.W.3d 692, 696 (Tex. 2003)).] "Immunity from suit is jurisdictional and bars suit; immunity from liability is not jurisdictional and protects from judgments." [*Id.*]
>
> In the present case, Alton appears to argue that it is immune from suit. Alton argues that this case is similar to *City of Galveston v. State of Texas*, in which the supreme court held that cities are immune from suits filed on behalf of the State by the Attorney General to recover money damages. [217 S.W.3d 466, 468 (Tex. 2007).] We find *City of Galveston* to be inapposite; here, the underlying suit does not involve the recovery of money damages.

92

The Texas Supreme Court has noted that certain declaratory[-] judgment actions do not implicate the doctrine of governmental immunity. [*Hous. Mun. Emps. Pension Sys. v. Ferrell*, 177 S.W.3d 502, 509 (Tex. App.—Houston [1st Dist.] 2005), *rev'd in part on other grounds*, 248 S.W.3d 151 (Tex. 2007); *Tex. Educ. Agency v. Leeper*, 893 S.W.2d 432, 446 (Tex. 1994) ("We conclude that by authorizing declaratory[-]judgment actions to construe the legislative enactments of governmental entities and authorizing awards of attorney fees, the [DJA] necessarily waives governmental immunity for such awards.").] An action for declaratory judgment seeking only a clarification of rights, attorney's fees, and costs—as here, in the underlying action—is not a suit for damages against the State and is not barred by governmental immunity. [*See City of San Benito v. Ebarb*, 88 S.W.2d 711, 721 (Tex. App.—Corpus Christi 2002, pet. denied). Moreover, we note that Alton waived any immunity-from-suit defense by filing a counterclaim seeking affirmative relief in the underlying action. *See City of Irving v. Inform Constr., Inc.*, 201 S.W.3d 693, 694 (Tex. 2006) (per curiam).]

We do not construe Alton's argument as asserting immunity to liability. Insofar as Alton attempted to raise such an issue, we conclude that the issue was inadequately briefed and was therefore waived. [*See* Tex. R. App. P. 38.1(i).]

*Id.* at *2 (footnotes were moved to the body).

Here, just as in *City of Alton*, there is no claim for monetary damages; instead, Northwest has asserted a counterclaim for declaratory judgment seeking construction of a term in the 1949 orders, attorneys' fees, and costs. Northwest's counterclaim's request for attorneys' fees for its declaratory-judgment action fits within the DJA, which has waived governmental immunity for such awards. *See id.* (citing *Leeper*, 893 S.W.2d at 446).

And just as in *City of Alton*, we do not construe Carroll's minimal argument on attorneys' fees as asserting immunity from liability. *See id.* To the extent that Carroll

93

attempted to raise such an issue, we conclude that the issue is inadequately briefed and is therefore waived.[43]  *See* Tex. R. App. P. 38.1(i).

Accordingly, we hold that the trial court did not err by awarding attorneys' fees to Northwest under the DJA.  We overrule the portion of Carroll's sixth issue regarding its immunity from the attorneys' fee award.

## C.  Carroll's Segregation Challenge Couched as an Excessiveness Challenge

In the remainder of its sixth issue, Carroll argues that the attorneys' fee award is excessive.  Specifically, Carroll contends that the award is excessive because "the vast majority of [Northwest's] attorney[s'] fees were incurred in [Northwest's] <u>unsuccessful</u> attempts to prevail in the three jurisdictional appeals."  In essence, Carroll argues that Northwest failed to segregate its fees between those incurred for *Carroll I* through *III* that dealt with pleas to the jurisdiction and the fees involved in the declaratory-judgment action.  We therefore construe Carroll's argument as a failure-to-segregate challenge.

---

[43]At the end of Carroll's one-sentence argument that we must dismiss the attorneys' fee award based on governmental immunity, Carroll cites a footnote in its brief in which it stated that "if the trial court did not have subject[-]matter jurisdiction, it should have dismissed instead of deciding on the merits."  Because immunity from suit, not immunity from liability, results in a lack of jurisdiction, we are further convinced that Carroll did not raise immunity from liability on appeal.  *See City of Dallas v. Albert*, 354 S.W.3d 368, 373 (Tex. 2011) ("Immunity from liability protects entities from judgments while immunity from suit deprives courts of jurisdiction over suits against entities unless the Legislature has expressly consented[.]").

The record reveals that after the bench trial concluded, both sides submitted affidavits with detailed invoices to support their requests for attorneys' fees. Carroll filed a motion for judgment that did not specifically mention attorneys' fees and concluded by stating that all costs should be adjudged against Northwest. After the trial court signed the final judgment, Carroll filed a motion to modify the judgment but did not mention the attorneys' fee award other than to question the summary-judgment language that appears in the paragraph awarding Northwest its attorneys' fees.[44] Because Carroll failed to assert its segregation complaint in the trial court, we hold that Carroll has waived its complaint. *See In re M.S.*, No. 02-20-00147-CV, 2020 WL 6066400, at *11 (Tex. App.—Fort Worth Oct. 15, 2020, no pet.) (mem. op.) (citing Tex. R. App. P. 33.1; *Hruska v. First State Bank of Deanville*, 747 S.W.2d 783, 785 (Tex. 1988) (holding that party opposing award of attorney's fees must object to failure to segregate fees in order to preserve the issue for appellate review); *Fritts v. McDowell*, No. 02-16-00373-CV, 2017 WL 3821889, at *8 (Tex. App.—Fort Worth Aug. 31, 2017, pet. denied) (mem. op.); *In re L.M.M.*, No. 03-04-00452-CV, 2005 WL 2094758, at *15 (Tex. App.—Austin Aug. 31, 2005, no pet.) (mem. op.)). We overrule the remainder of Carroll's sixth issue challenging the award of attorneys' fees.

---

[44]We address this as part of Northwest's cross-point, *infra*.

## V. Northwest's "Cross-Points"

At the end of Northwest's brief, it raises three "cross-points." Northwest's first cross-point asks for two modifications to the judgment: (1) modify the judgment to describe the location of the school districts' boundary in the text of the judgment instead of referencing an exhibit and (2) modify the judgment to state that the attorneys' fees were awarded on the basis of a trial on the merits, not a summary judgment. Northwest's second and third cross-points challenge the trial court's failure to (a) strike Carroll's expert witnesses Brittain, Jeffress, and Gold and (b) grant Northwest's re-urged plea to the jurisdiction. Because Northwest did not file a notice of appeal, we cannot address its second and third cross-points. *See* Tex. R. App. P. 25.1(c) ("A party who seeks to alter the trial court's judgment or other appealable order must file a notice of appeal."). Because Northwest's first cross-point seeks only scrivener's changes to the judgment, we address those requested changes. *See* Tex. R. App. P. 43.2(b); *cf. Dupnik v. Hermis*, No. 04-12-00417-CV, 2013 WL 979199, at *6 (Tex. App.—San Antonio Mar. 13, 2013, pet. denied) (mem. op.) ("An appellate court has the authority to modify an incorrect judgment, even without a party's request, when the record contains the necessary information to do so.").

The judgment contains the following description of the location of the school districts' boundary:

> IT IS FURTHER ORDERED, ADJUDGED[,] AND DECREED that the common boundary line separating the Northwest Independent School District and the Carroll Independent School District is the line

96

retraced by surveyor W.C. Wilson, given by coordinates set forth in Exhibit B to the Resolution of the Northwest Independent School District Board of Trustees dated October, 2003, and admitted into evidence in this matter as Defendants' Exhibit 123, page bates nos. NISD/CISD 2950–2951.

Northwest asks that we modify the judgment to include the specific description of the boundary's location instead of referencing a Bates-stamped exhibit in the voluminous record. Carroll's reply brief did not respond to any of Northwest's cross-points.[45] Because the trial court's mention of Defendants' Exhibit 123 in the judgment is a perfectly acceptable way to reference the school districts' boundary, especially one of this length, we decline Northwest's request to modify the judgment to include the specific description of the boundary's location. But because the judgment did not attach the referenced pages from the exhibit, we modify the judgment to specifically state that the referenced Bates-stamped pages are attached, and we attach those pages to this opinion as Exhibit B:

> IT IS FURTHER ORDERED, ADJUDGED[,] AND DECREED that the common boundary line separating the Northwest Independent School District and the Carroll Independent School District is the line retraced by surveyor W.C. Wilson, given by coordinates set forth in Exhibit B to the Resolution of the Northwest Independent School District Board of Trustees dated October, 2003, admitted into evidence in this matter as Defendants' Exhibit 123, page bates nos. NISD/CISD 2950–2951, and attached to this judgment.

---

[45]Carroll filed a motion to modify the judgment in which it requested that the trial court modify the judgment "to say expressly where the school district boundary is located, without referring to another document" and to remove or clarify the statement referencing the summary judgment. Thus, it appears that Carroll is in agreement with the modifications requested by Northwest on appeal.

Northwest also asks that we correct a typographical error in the judgment. The paragraph of the judgment containing the typographical error is as follows:

> IT IS FURTHER ORDERED, ADJUDGED[,] AND DECREED that it is equitable and just under Tex. Civ. Prac. & Rem. Code § 37.009 that *Defendants' Motion for Summary Judgment 58* Defendants be awarded their reasonable and necessary attorneys' fees and costs incurred in this matter as follows, with all attorneys' fees and costs being taxed to Plaintiff: . . . . [Emphasis added.]

We agree that the italicized language should not have been included in the judgment. We modify the judgment to delete that paragraph and replace it with the following paragraph:

> IT IS FURTHER ORDERED, ADJUDGED[,] AND DECREED that it is equitable and just under Tex. Civ. Prac. & Rem. Code Ann. § 37.009 that Defendants be awarded their reasonable and necessary attorneys' fees and costs incurred in this matter as follows, with all attorneys' fees and costs being taxed to Plaintiff: . . . .

We make no change to the enumerated paragraphs that follow that paragraph in the final judgment.

## VI. Conclusion

Having overruled Carroll's dispositive issues and having modified the judgment to attach the Bates-stamped pages of the exhibit that it references and to correct a typographical error, we affirm the trial court's judgment as modified.

/s/ Bonnie Sudderth
Bonnie Sudderth
Chief Justice

Delivered: July 1, 2021

Exhibit A

ORIGINAL

CAUSE N0.141-210251-05

| CARROLL INDEPENDENT SCHOOL | § | IN THE DISTRICT COURT |
| DISTRICT | § | |
| PLAINTIFF, | § | |
| | § | |
| Vs. | § | |
| | § | |
| NORTHWEST INDEPENDENT SCHOOL | § | 141ˢᵗ JUDICIAL DISTRICT |
| DISTRICT AND JOSH WRIGHT, MARK | § | |
| SCHLUTER, DEVONNA HOLLAND, | § | |
| JUDY COPP, ANN DAVIS-SIMPSON, | § | |
| LILLIAN RAUCH AND DR. RYDER | § | |
| WARREN IN THEIR OFFICIAL | § | |
| CAPACITIES, | § | |
| DEFENDANTS. | § | TARRANT COUNTY, TEXAS |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

FINDINGS OF FACT

1.      Northwest Independent School District (hereinafter "NISD") was created by the citizens of Tarrant, Wise, and Denton counties in duly noticed and held elections in 1948 and 1949 (the " 1949 Election").

2.      NISD encompasses territory in Denton, Tarrant, and Wise Counties.

3.      The 1949 election creating NISD was a consolidation of the Justin Rural High School District (of Denton County), the Roanoke Independent School District (hereinafter "Roanoke ISD") (of Denton and Tarrant Counties), the Haslet Common School District No. 97 (of Denton and Tarrant Counties), and the Rhome Independent School District (of Wise County).

4.      Shortly thereafter, in 1949, the Fairview Common School District No. 39 (of Wise County) was consolidated with NISD.

5.      Carroll Independent School District (hereinafter "CISD") or its predecessor district, Carroll School District No. 99 did not contest the creation of NISD in 1949.

6.      NISD's boundaries after the consolidation election in 1949 contained a total of 126,062 acres of land, more or less, and was a consolidation of all the lands comprising the school districts known before the consolidation, not the boundaries of a particular county.

FINDINGS OF FACT AND CONCLUSIONS OF LAW                                    1 | P a g e

 E-MAILED 7/13/18

2974          ᵞₜ

99

7. In August 1901, the Commissioners Court of Denton County, Texas found that several of the school districts' boundaries in Denton County were vague and uncertain and that it was "necessary that they [the boundaries of the school districts] should be defined with certainty."

8. The Denton County Commissioners Court then ordered that the boundaries of the several school districts be corrected and the Commissioners Court of Denton County issued an order describing ninety one (91) school districts in Denton County by metes and bounds.

9. The August 1901 order of the Denton County Commissioners Court included the following districts that eventually would become part of NISD:

a. Elizabeth No. 58
b. Roanoke No. 59
c. Walnut Grove No. 73
d. Helm No. 83
e. Avondale No. 90

10. The Denton County Commissioners Court Order creating the Walnut Grove No. 73 contains a descriptor(s) that places its boundary on the White Line (as defined below).

11. In July 1909, the Denton County Commissioners Court approved the election and incorporation of Roanoke Independent School District which contains a descriptor that places its boundary on the White Line and includes a sketch map of the Roanoke that denotes the south line of Denton County was the White Line.

12. In January 1949, W.F. Anderson sold two tracts of land to the United States of America. One tract was solely within Denton County and the other tract was solely within Tarrant County. The tracts are near the Disputed Area (as defined below).

13. In the deeds, Anderson and the United States of America recognized the north line of the A.S. Harris Survey and the south line of the John Guess Survey as the Tarrant County and Denton County line in 1949. Surveyor Wilson's retracement survey of the White Line passes 33.70 feet south of the common east corner of the Harris and Guess Surveys.

14. In 1910, the Tarrant County Commissioners Court laid out metes and bounds of ninety three (93) districts. The following districts eventually would become part of NISD:

a. Haslet No. 3
b. Henrietta No. 4
c. Avondale No. 90

15. The metes and bounds description of Lonesome Dove No. 7 contains the following call: "thence North to Denton County line; thence west with Denton County line to S.E. corner of F. L.

Harris Survey." The northwest corner of the A. S. Harris Survey is common with the southeast corner of the F. L. Harris Survey. (See FOF 12-13). The W. C. Wilson retracement of the White Line places the White Line 90.9 feet south of the southeast corner of the F. L. Harris Survey. The Gilley Line survey in 2004, is 1677.81 feet north of the southeast corner of the F. L. Harris Survey.

16.    In May 1932, the Denton County Commissioners Court ordered and recognized the Haslet Common School District, also referred to the Common School District No. 97, which was established in 1917 and described its boundaries by metes and bounds. Haslet Common School District later became part of NISD.

17.    The boundary description of the Haslet Common School District provides three direct connections to the county line from corners of Original Land Surveys making it possible to locate the Tarrant County and Denton County boundary line on the ground in 1932. Two of the calls place the Tarrant/Denton County line in close proximity to the White Line.

18.    In 1947, Roanoke Independent School District was created by the Denton County Commissioners Court by consolidating Elizabeth No. 58, Walnut Grove No. 73, and Roanoke ISD. The Roanoke ISD was later consolidated into NISD in 1949.

19.    The NISD boundary description as approved in the 1949 consolidation election states:

a.    "BEGINNING at the Southeast corner of Wise County, same being the Southwest Corner of Denton County and on the North Boundary line of Tarrant County, a point within the Matthew Ashton Survey; ..."

b.    " ... THENCE East to the Northeast corner of said R.A. Smith Survey;

THENCE South to the County line between Denton and Tarrant Counties;

THENCE West along said County Line to a point in said line due North of the Northwest corner of the M. Hunt Survey in Tarrant County... "

20.    CISD was incorporated in 1959 after an election ordered by the County Judge of Tarrant County based on a petition filed on February 23, 1959 by the requisite number of inhabitants of Carroll Common School District #99 (the "Petition").

21.    The Petition contains a boundary description of the area to be incorporated as CISD which was declared by the petitioners of the Petition to be "definite."

22.    On March 4, 1959, the County Judge of Tarrant County ordered an election for the purpose of determining whether Carroll Common School District #99 should be incorporated as the Carroll Independent School District.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**                    3 | Page

23. In the March 4. 1959 Order, the County Judge of Tarrant County declared and found the field notes in the Petition "contain a definite description by metes and bounds of the District proposed to be so incorporated .... "

24. The County Judge of Tarrant County ordered that the Petition's "definite description" of the boundaries of the Carroll Common School District #99 be attached to his order calling the election whether the Carroll Common School District #99 should be incorporated as the Carroll Independent School District.

25. On March 23. 1959, the County Judge of Tarrant County declared passage of the incorporation election ordering the incorporation of Carroll Independent School District and ordering the boundaries of Carroll Independent School District to be the same as those set forth in the Petition and the March 4, 1959 Order calling the election, both of which were declared by the County Judge of Tarrant County as having a "definite description" of the boundaries.

26. CISD is located entirely in Tarrant County.

27. The CISD boundary description as approved in the 1959 incorporation election states:

a. "Beginning in the North line of Tarrant County at a point directly north of the most northerly, northwest corner of the John L. Whitman Survey in Tarrant County; ..."

b. " ... THENCE North to a point in the North line of Tarrant County..."

28. George White ("White") surveyed and marked on the ground the boundary line between Denton and Tarrant Counties in December 1852 and January 1853 (the "White Line").

29. White returned his field notes to Denton County and the field notes were later filed with the General Land Office.

30. As of 1959, White's field notes were the only field notes filed with the General Land Office that described the Tarrant/Denton County line.

31. CISD has never objected to the George White field notes filed with the General Land Office.

32. Before 2003, CISD did not object to the field notes of NISD that NISD filed with the Texas Education Agency ("TEA").

33. On October 10, 2003, NISD filed an updated boundary description of NISD via a survey and map from a qualified surveyor that defines the boundaries of NISD along the White Line.

34. The White Line can be found on the ground.

FINDINGS OF FACT AND CONCLUSIONS OF LAW                4 | P a g e

35.     The White Survey of the boundary line between Denton and Tarrant Counties conformed to the legislative direction contained in "An Act Better Defining the Boundaries of Denton County," approved January 1852, 4th. Leg., R.S., 1852 Tex. Gen. Laws 32, *reprinted in* 3 H.P.N. Gammel, *The Laws of Texas 1822-1897*, at 910 (Austin, Gammel Book Co. 1898).

36.     A retracement survey of the White Line, as marked on the ground and recorded by White's field notes, which are on file in the Texas General Land Office, was retraced by William C. Wilson, Jr. a Licensed State Land Surveyor, in 1999 and such retracement locates the position of the White Line with the precision required by the Texas board of Professional Land Surveying.

37.     The first milepost on the White Line as reestablished by William C. Wilson, Jr. is at a point located on the Texas Coordinate System of 1927 – North Central Zone, y = 479483.2 feet (northing); x = 2139631.6 feet (easting).

38.     The second milepost on the White Line as reestablished by William C. Wilson, Jr. is at a point located on the Texas Coordinate System of 1927 – North Central Zone, 7 = 479586.8 feet (northing; x = 2134296.3 (easting).

39.     The third milepost on the White Line as reestablished by William C. Wilson, Jr. is at a point located on the Texas Coordinate System of 1927 – North Central Zone, y = 479696.8 feet (northing); x = 2128998.6 feet (easting).

40.     The fourth milepost on the White Line as reestablished by William C. Wilson, Jr. is at a point located on the Texas Coordinate System of 1927 – North Central Zone, y = 479806.9 feet (northing); x = 2123700.9 feet (easting).

41.     The fifth milepost on the White Line as reestablished by William C. Wilson, Jr. is at a point located on the Texas Coordinate System of 1927 – North Central Zone, y = 479916.9 feet (northing); x = 2118403.2 feet (easting).

42.     The sixth milepost on the White Line as reestablished by William C. Wilson, Jr. is at a point located on the Texas Coordinate System of 1927 – North Central Zone, y = 480026.9 feet (northing); x = 2113105.5 feet (easting).

43.     The seventh milepost on the White Line as reestablished by William C. Wilson, Jr. is at a point located on the Texas Coordinate System of 1927 – North Central Zone, y = 480136.9 feet (northing); x = 2107807.8 feet (easting).

44.     The eighth milepost on the White Line as reestablished by William C. Wilson, Jr. is at a point located on the Texas Coordinate System of 1927 – North Central Zone, y = 480218.9 feet (northing); x = 2102442.5 feet (easting).

45. The ninth milepost on the White Line as reestablished by William C. Wilson, Jr. is at a point located on the Texas Coordinate System of 1927 – North Central Zone, y = 480300.9 feet (northing); x = 2097077.1 feet (easting).

46. The tenth milepost on the White Line as reestablished by William C. Wilson, Jr. is at a point located on the Texas Coordinate System of 1927 – North Central Zone, y = 480439.8 feet (northing); x = 2091771.4 feet (easting).

47. The eleventh milepost on the White Line as reestablished by William C. Wilson, Jr. is at a point located on the Texas Coordinate System of 1927 – North Central Zone, y = 480578.7 feet (northing); x = 2086465.7 feet (easting).

48. The twelfth milepost on the White Line as reestablished by William C. Wilson, Jr. is at a point located on the Texas Coordinate System of 1927 – North Central Zone, y = 480717.5 feet (northing); x = 2081159.9 feet (easting).

49. The thirteenth milepost on the White Line as reestablished by William C. Wilson, Jr. is at a point located on the Texas Coordinate System of 1927 – North Central Zone, y = 480856.4 feet (northing); x- 2075854.2 feet (easting).

50. The fourteenth milepost on the White Line as reestablished by William C. Wilson, Jr. is at a point located on the Texas Coordinate System of 1927 – North Central Zone, y = 480995.3 feet (northing); x = 2070548.5 feet ( easting).

51. The fifteenth milepost on the White Line as reestablished by William C. Wilson, Jr. is at a point located on the Texas Coordinate System of 1927 – North Central Zone, y = 481134.2 feet (northing); x = 2065242.8 feet (easting).

52. The sixteenth milepost on the White Line as reestablished by William C. Wilson, Jr. is at a point located on the Texas Coordinate System of 1927 – North Central Zone, y = 481273.1 feet (northing); x = 2059937.1 feet (easting).

53. The seventeenth milepost on the White Line as reestablished by William C. Wilson, Jr. is at a point located on the Texas Coordinate System of 1927 – North Central Zone, y = 481412.0 feet (northing); x = 2054631.3 feet (easting).

54. The eighteenth milepost on the White Line as reestablished by William C. Wilson, Jr. is at a point located on the Texas Coordinate System of 1927 – North Central Zone, y = 481550.9 feet (northing); x = 2049325.6 feet (easting).

55. The nineteenth milepost on the White Line as reestablished by William C. Wilson, Jr. is at a point located on the Texas Coordinate System of 1927 – North Central Zone, y = 481689.8 feet (northing); x = 2044019.9 feet ( easting).

56. The twentieth milepost on the White Line as reestablished by William C. Wilson, Jr. is at a point located on the Texas Coordinate System of 1927 – North Central Zone, y = 481828.6 feet (northing); x = 2038714.2 feet (easting).

57. The twenty-first milepost on the White Line as reestablished by William C. Wilson, Jr. is at a point located on the Texas Coordinate System of 1927 – North Central Zone, y = 481967.5 feet (northing); x = 2033408.5 feet (easting).

58. The Tarrant County Appraisal District ("TAD") has appraised property for CISD since 1981 and Woody Boykin is the creator of CISD's tax map system that is maintained by TAD.

59. TAD first created the tax map system for CISD and other taxing units in Tarrant County beginning in 1 981. This tax map system shows the school district boundaries for those school districts TAD represents, including CISD.

60. In creating the tax map system showing CISD's boundaries, TAD relied on data supplied by various taxing units, including the counties school districts and cities involved; specifically, TAD relied on the data supplied by CISD.

61. The tax map system created by TAD is important because these maps affect the accuracy of the district's appraisal records and the eventual taxation of the area's residents, because the tax assessors for the school districts rely on the accuracy of TAD's appraisal records for assessing taxes, and because these tax maps affect the tax rolls of the entities TAD represents.

62. Pursuant to its statutory duties, TAD has continuously identified NISD as the only district taxing unit in the Disputed Area, without interpretation or objection, since 1981. TAD has never identified CISD as the taxing jurisdiction of any tract of land located in the Disputed Area.

63. TAD continues to identify NISD as the taxing jurisdiction in the Disputed Area because this has been the "status quo" since TAD was created in 1981.

64. TAD did not identify CISD as the taxing jurisdiction in the Disputed Area after the *Tarrant County v. Denton County* decision was because the school district line had not moved as a result of that decision.

65. TAD has never been ordered to change NISD's designation as the proper taxing jurisdiction in the Disputed Area.

66. In establishing CISD's boundary with NISD for the appraisal records and tax map system that TAD has historically used since 1981, the boundary line was where CISD told TAD it was.

67. Before the *Tarrant County v. Denton County* lawsuit, the White Line was the only boundary line recognized by, and filed of record in, the Texas General Land Office separating Denton and Tarrant Counties.

68. In 1986, Tarrant County, Denton County, Dallas County, and Collin County entered into an Interlocal Agreement regarding, inter alia, the Tarrant County and Denton County line.

69. NISD was not a party to the Interlocal Agreement.

70. NISD was not a third party beneficiary of the Interlocal Agreement.

71. CISD was not a party to the Interlocal Agreement.

72. CISD was not a third party beneficiary of the Interlocal Agreement.

73. The *Tarrant County v. Denton County* lawsuit determined the true boundary between Tarrant County and Denton County. The true boundary between Tarrant County and Denton County is known as the Gilley Line.

74. CISD has admitted that it does not seek to give retroactive effect to the *Tarrant County v. Denton County* lawsuit.

75. NISD was not a party to the *Tarrant County v. Denton County* lawsuit.

76. NISD did not intervene in the *Tarrant County v. Denton County* lawsuit.

77. CISD was not a party to the *Tarrant County v. Denton County* lawsuit.

78. The Gilley Line did not exist in 1949 and did not exist until 2004.

79. Both CISD and NISD claim the area between the Gilley Line and the White Line which includes the taxing line between NISD and CISD ("Disputed Area").

80. The Britain exhibit depicts the Gilley Line, the White Line, and the taxing line.

81. Before 2004, CISD agreed that the Disputed Area was in NISD.

82. NISD and CISD agreed by custom and usage that the Disputed Area is in NISD.

83. The agreement of CISD and NISD that the Disputed Area is in NISD may be implied or expressed. *Duval County Ranch Co. v. Foster*, 318 S.W.2d 25, 30 (Tex. Civ. App. - San Antonio 1958, writ refd n.r.e.); *Gulf Oil Corp. v. Marathon*, 152 S.W.2d 711, 714 (Tex. 1941).

84. CISD has judicially admitted that the 1949 NISD Consolidation Order is not ambiguous.

85. CISD has judicially admitted that the field notes m the 1949 NISD Consolidation Order describing the NISD and CISD common boundary were unambiguous.

86. Before 2004, CISD never asserted that its common boundary with NISD was located on the Gilley Line.

87. Before 2004, CISD never asserted that its common boundary with NISD was not the White Line.

88. Before 2004, CISD never asserted its common boundary line with NISD was doubtful, uncertain, or disputed.

89. CISD has admitted this lawsuit is an attempt to move the CISD and NISD common boundary line to the Gilley Line from the former boundary of CISD and NISD.

90. CISD never sought to annex the Disputed Area in compliance with §13.051, TEXAS EDUCATION CODE.

91. CISD did not exhaust its administrative remedies through the Commissioner of Education in compliance with the Texas Education Code before filing this lawsuit.

92. Before 2004, CISD made statements that the Disputed Area was in NISD and intended that others act in good faith upon such statements.

93. Before 2004, the previous acts of the NISD and its Board of Trustees in the Disputed Area were validated by the Texas Legislature.

94. The acts of NISD Board of Trustees were not and are not *ultra vires* in the Disputed Area.

95. CISD's corporate representative is Dr. David Flatys, who has been superintendent of CISD since 2005.

96. CISD, through its corporate representative and superintendent, admits:

a. Both CISD and NISD have considered the Disputed Area to be located in NISD from 1959 through 2005.

b. From 1959 to the date this lawsuit was filed, CISD was not aware of any attempts by CISD to levy and collect taxes in the Disputed Area.

FINDINGS OF FACT AND CONCLUSIONS OF LAW                    9 | P a g e

2982

c.      From 1959 to the date this lawsuit was filed, CISD allowed NISD and did not object to NISD conducting and engaging in taxing, educating students, holding elections and issuing bonds in the Disputed Area.

d.      From 1959 until the date this lawsuit was filed, CISD acknowledges that NISD provided a free education to the children who resided within the Disputed Area; NISD provided busing of children who resided within the Disputed Area; and that CISD did not transport the children within the Disputed Area.

e.      In 2003, CISD, by action of its Board of Trustees, acknowledged that the students living in the Disputed Area were not residents of CISD (i.e., the students were, instead, residents of NISD) by modifying its interdistrict Board Policy FDA (LOCAL) to permit these NISD students (i.e., those who reside in the Disputed Area) to attend CISD's schools as "transfers", but only when "space is available." However, these NISD "interdistrict" (as opposed to "intradistrict") transfer students are not provided free transportation services that CISD resident students receive. CISD's Board Policy FDA (LOCAL) only applies to transfers between school districts permitting enrollment of "out-of-district" students - in other words, this policy modification shows CISD itself considered the students residing in the Disputed Area to be "out-of-district."

f.      CISD continues to respect and act in accordance with where the original line was located.

g.      CISD believes the boundary line between NISD and CISD moved north of the original line to the Gilley Line.

h.      Since the 1950's, NISD has held multiple school district elections in which the landowners/residents in the Disputed Area voted to elect members of the Board of Trustees of the NISD. CISD has never held school district elections in the Disputed Area to elect members of the Board of Trustees of CISD.

i.      Since the 1950's, NISD has held numerous bond elections for which the land in the Disputed Area could be taxed, to the extent necessary, to pay for those bonds. CISD has never held a bond election for which the land in the Disputed Area would be taxed by CISD to pay for those bonds.

j.      Since the 1950's, NISD has issued numerous bonds for which the NISD pledged that the land in the Disputed Area could be taxed, to the extent necessary, to pay for the bonds. CISD has never undertaken to sell bonds pledging land in the Disputed Area.

97.     CISD seeks to move the CISD and NISD common boundary line to the Gilley Line.

98.     CISD has never held bond elections or school board trustee elections in the Disputed Area.

FINDINGS OF FACT AND CONCLUSIONS OF LAW                    10 | Page

2983

108

99. Carroll Common School District #99 did not file an election contest lawsuit in accordance with the law challenging (1) the 1949 NISD consolidation election or (2) its boundaries or the 1959 incorporation of CISD.

100. Tax revenue generated by ad valorem taxes assessed and collected in the Disputed Area has never been applied to pay for bonds issued by CISD.

101. CISD has never assessed ad valorem taxes on real property within the Disputed Area.

102. Before filing this lawsuit, CISD never treated students in the Disputed Area as residents but instead as transfer students subject to the transfer and transportation policies of CISD.

103. The circumstances clearly demand the application of estoppel to prevent manifest injustice. *City of White Settlement* v. *Super Wash, Inc.*, 198 S.W. 3d 770, 774 (Tex. 2996). Under the totality of the circumstances in this case justice, honesty, and fair dealing require the application of estoppel. *City of Fredericksburg* v. *Bopp*, 126 S.W.3d 218, 223 (Tex. App.- San Antonio 2003, no pet.).

104. An award of attorneys' fees to NISD would be equitable and just.

105. NISD incurred reasonable and necessary attorneys' fees in the amount of $850,055.00 for services rendered through the trial of this case.

106. A reasonable and necessary attorneys' fees for NISD in the event CISD unsuccessfully appeals to the court of appeals would be an additional $100,000.00.

107. A reasonable and necessary attorneys' fees for NISD in the event of filing or responding to a Petition for Review to the Texas Supreme Court is an additional $75,000.00.

108. A reasonable and necessary attorneys' fees for NISD in the event of a successful appeal to the Supreme Court of Texas would be an additional $50,000.00.

109. All findings of fact shall also be deemed to be conclusions of law. To the extent any finding of fact is a conclusion of law or is a mixed question of law and fact, the same is concluded as a matter of law.

## CONCLUSIONS OF LAW

1. CISD's claims for declaratory relief and ultra vires are denied.

2. NISD's counterclaim for declaratory relief states a claim for affirmative relief which is independent of CISD's claim for relief.

FINDINGS OF FACT AND CONCLUSIONS OF LAW                    11 | P a g e

2984

3.   NISD's counterclaim for declaratory relief is granted.

4.   The common boundary line between NISD and CISD located on the "County line between Denton and Tarrant Counties" as described in the NISD consolidation election in 1949 and ordered and approved by the Denton County Commissioners Court in 1949 is the White Line as retraced by William C. Wilson in 1999, a description on the ground of which is found in Findings of Fact Nos. 37-57. See also Finding of Fact No. 33.

5.   CISD claims are an attempt to move the CISD and NISD common boundary line to the Gilley Line from the White Line.

6.   CISD never sought to annex the Disputed Area in compliance with §13.051, TEXAS EDUCATION CODE.

7.   The Texas Education Code is a pervasive regulatory scheme that covers inaccurate boundaries, transfer of territory, and the transfer of students.

8.   The Texas Education Code is the exclusive jurisdiction for transferring territory between school districts.

9.   CISD never sought relief or exhausted its administrative remedies for transferring territory through the Texas Education Code and its administrative processes and therefore, this Court is without jurisdiction to grant CISD's declaratory relief.

10.   CISD failed to exhaust its administrative remedies with the Commissioner of Education for all of its claims arising under the school laws of Texas.

11.   The place at which the original surveyor identified the line for the NISD boundary in 1949 determines the location of the "County line between Denton and Tarrant Counties" which is referenced in the property description of the 1949 NISD consolidation election. *(City of Carrollton v. Duncan*, 742 S.W.2d 70, 72 (Tex. App.- Ft. Worth 1987, no writ.).

12.   Any evidence which is the best available tendering to establish the footstep of the original surveys is admissible for such purpose. *Kardell v. Crouch*, 326 S.W.2d 869, 879 (Tex. Civ. App.- Austin 1959, writ refd n.r.e.).

13.   The ancient maps and plats admitted in this case are admissible evidence to show the location or boundaries.

14.   Boundaries may be proved by hearsay evidence. *Hamill v. Bahr*, 271 S.W. 2d 319, 321 (Tex. Civ. App.- Galveston 1954, no writ).

2985

110

15. The footsteps of the original surveyor, if they can be ascertained, should be followed... However, if the location of the actual footsteps of the surveyor cannot be established with reasonable certainty, all the surrounding facts and circumstances should be considered in order to arrive at the purpose and intent of the surveyor who made the original surveyor. *TH Investments. Inc. v. Kirby Inland Marine. L.P.* 218 S.W. 3d 173, 204 (Tex. App.- Houston [14lh Dist.] 2007, pet. denied).

16. The property description of the boundary described in the CISD incorporation election approved by the Tarrant County Judge in the 1959 CISD incorporation election is definite and thus CISD's claims are a collateral attack on the 1959 CISD incorporation election and order.

17. If the descriptors "beginning in the North line of Tarrant County at a point directly north of the most northerly, northwest corner of the John L. Whitman Survey in Tarrant County; ... " and " ... THENCE North to a point in the North line of Tarrant County ... " as described in the CISD incorporation election and ordered by the Tarrant County Judge in 1959 are uncertain, unambiguous, or did not exist in 1959, the ambiguity is latent and subject to rules of construction and extrinsic evidence to properly interpret the description and to give effect to the parts of the description that will accomplish, rather than defeat, the intention of the authors of the boundary descriptor.

18. The property description of the boundary described in the NISD consolidation election approved in the 1949 was defined with certainty.

19. If the descriptor "County line between Denton and Tarrant Counties" set forth in the NISD boundary established by the Denton County Commissioners Court in 1949 is uncertain, ambiguous, or did not exist in 1949, the ambiguity is latent and subject to rules of construction and extrinsic evidence to properly interpret the description and to give effect to the parts of the description that will accomplish, rather than defeat, the intention of the authors of the boundary descriptor.

20. If the descriptors of the 1949 Denton County Commissioners Order creating NISD or the 1959 Tarrant County Judge's Order incorporating CISD contains an ambiguity, the Court may rely on rules of construction and extrinsic evidence to interpret properly the description and to give effect to the description that will accomplish rather than defeat the intention of the parties. *Universal Home Builders, Inc. v. Farmer,* 327 S.W.2d 737, 742 (Tex. Civ. App. - Tyler 1964, no writ).

21. The evidence shows that the descriptor "County line between Denton and Tarrant Counties" set forth in the NISD boundary established by the Denton County Commissioners Court in 1949 is the White Line.

FINDINGS OF FACT AND CONCLUSIONS OF LAW    13 | P a g e

2986

111

22. CISD's claims are barred because CISD failed to meet the jurisdictional requirements of standing or providing proper and timely notice of its contest of the 1948 and 1949 elections creating the NISD.

23. CISD's claims are barred because NISD's boundary as it existed m 1949 has been validated by law.

24. Before 2004, all acts of NISD and its Board of Trustees were validated by law.

25. CISD's claims that the common boundary line between CISD and NISD is the Gilley Line fails because the judgment in the *Tarrant County v. Denton County* lawsuit may not be applied retroactively to the CISD and NISD boundary in violation of Art. 1, §16, TEXAS CONSTITUTION and §311.022, GOVERNMENT CODE.

26. The Gilley Line does not apply retroactively.

27. Neither NISD nor CISD was a party to, nor bound by, the Interlocal Agreement nor the *Tarrant County v. Denton County* Lawsuit.

28. The *Tarrant County v. Denton County* Lawsuit did not rule on the boundaries of CISD nor NISD.

29. CISD's claims are barred because it lacks standing to collaterally attack the election results from 1949 and the Wise, Tarrant and Denton County Commissioners Order(s) approving and creating NISD in 1949.

30. CISD's claims are barred because it lacks standing to collaterally attack the election results from 1959 and the Tarrant County Judges' Order(s) approving and consolidating CISD in 1959.

31. CISD's claims are proprietary functions.

32. CISD's claims are barred by the doctrine of boundary of ratification/acquiescence.

33. CISD's claims are barred by the doctrine of boundary of estoppel.

34. CISD's claims are barred by the doctrine of boundary by agreement.

35. CISD's claims are barred by implied agreement from asserting changes to the common boundary line being the White Line.

36. CISD's claims are barred by promissory estoppel.

37. CISD's claims are barred by laches.

FINDINGS OF FACT AND CONCLUSIONS OF LAW

2987

38.    CISD's defenses of governmental immunity, collateral estoppel, res judicata, stare decisis, and judicial estoppel are denied.

39.    CISD's claims for attorneys' fees are denied.

40.    NISD is entitled to recover its reasonable and necessary attorneys' fees for the trial and any appeal of this action pursuant to the Texas Uniform Declaratory Judgments Act, TEX. CIV. PRAC. & REM. CODE §37.001, et seq. The award of these fees to NISD is equitable and just.

41.    NISD is entitled to recover post judgment interest on the total sum rendered in the Final Judgment at the statutory rate of five percent (5%) per annum, compounded annually, from the date of the Final Judgment until paid.

SIGNED this ___13___ day of ___July___, 2018.


_____
JUDGE PRESIDING


FINDINGS OF FACT AND CONCLUSIONS OF LAW          15 | P a g e

2988

113

Page 4–Northwest Independent School District Boundary Lines

Thence E to the NE corner of said Caspary Survey;

Thence NEasterly in a county road to the NW corner of the William Gibson Survey;

Thence E to the NE corner of the B.W. Wines Survey;

Thence S to the SE corner of said Wines Survey in the N line of the J.T. Stewart Survey;

Thence E 251 varas to the center of the N line of said Stewart Survey;

Thence S through the center of said J.T. Stewart survey and the Wilson Medlin Survey to the S line of said Medlin Survey;

Thence W to the NW corner of said R.W. Allen Survey;

Thence S to the center of the channel of Denton Creek;

Thence down the channel of Denton Creek to the N line of the R.A. Smith Survey;

Thence E to the NE corner of said R.A. Smith Survey;

Thence Southerly, with the east line of the R.A. Smith Survey, Abstract No. 1159, to a point that intersects Denton and Tarrant Counties line that was reestablished by said W.C. Wilson, Jr, L.S.L.S., between the fourth and fifth milepost monuments, fourth milepost bears South 88° 48' 38" East, with a Texas State Plane Coordinate System of NAD-27 – North Central Zone, Y = 479806.9 feet (northing), X = 2123700.9 feet (easting);

Thence North 88° 48' 38" West, with said County Line passing the Grapevine-Colleyville I.S.D. and the Carroll I.S.D. line that intersects said County Line at a point directly north of the most northerly, northwest corner of the John L. Whitman Survey, Tarrant County and continuing to the fifth milepost monument, with a Texas State Plane Coordinate System of NAD-27 – North Central Zone, Y = 479916.9 feet (northing), X = 2118403.2 feet (easting);

Thence North 88° 48' 38" West, continuing with said County Line, a distance of 5298.84 feet to the sixth milepost monument, with a Texas State Plane Coordinate System of NAD – 27 – North Central Zone, Y = 480026.9 feet (northing), X = 2113105.5 feet (easting);

Thence North 88° 48' 38" West, continuing with said County Line, a distance of 5298.84 feet to the seventh milepost monument, with a Texas State Plane Coordinate System of NAD – 27 – North Central Zone, Y = 480136.9 feet (northing), X = 2107807.8 feet (easting);

Thence North 89° 07' 28" West, continuing with said County Line, a distance of 5365.93 feet to the eighth milepost monument, with a Texas State Plane Coordinate System of NAD – 27 – North Central Zone, Y = 480218.9 feet (northing), X = 2102442.5 feet (easting);

Thence North 89° 07' 28" West, continuing with said County Line, a distance of 5366.03 feet to the ninth milepost monument, with a Texas State Plane Coordinate System of NAD – 27 – North Central Zone, Y = 480300.9 feet (northing), X = 2097077.1 feet (easting);

NISD/CISD  - 2950

Thence North 88° 30' 01" West, with said County Line passing the Carroll I.S.D. and the Keller I.S.D. line that intersects said County Line at a point that is 150 varas east of the southwest corner of the J. Childress Survey and directly north of the south line of said J. Childress Survey and continuing to a point on said County Line from which the tenth milepost monument bears North 88° 30' 01" West, with a Texas State Plane Coordinate System of NAD – 27 – North Central Zone, Y = 480439.8 feet (northing), X = 2091771.4 feet (easting) and said point being due north of the northwest corner of the M. Hunt Survey, Tarrant County, Texas;

Thence S passing the NW corner of said M. Hunt Survey to a point 1425 varas S of the NW corner of said Hunt Survey;

Thence W to the E line of the Jesse Gibson Survey;

Thence N 475.2 varas;

Thence W 950.4 varas;

Thence S 950.4 varas to the S line of the Jesse Gibson Survey;

Thence W to the NE corner of the Gustavus Gilbert Survey;

Thence S 600 varas;

Thence W to the E line of the right-of-way of the T&PRR Co.;

Thence N 24 degrees 50 minutes E with the E line of said right-of-way to the S line of the Francisco Cuella Survey;

Thence W at 950.4 varas, the NW corner of the J.J. Roberts Survey, in all 1642 varas;

Thence W on a line projected to the SE corner of the Z.D. Davis Survey;

Thence W 73 varas;

Thence S 424 varas to a point in the N line of the T. Logan Survey;

Thence NE 68 degrees 80 varas;

Thence S 1924 varas to the SE corner of the G.W. Parker Survey;

Thence W 1163 varas to the SW corner of same;

Thence N 1250 varas to the NW corner of same and the NE corner of the W. Houston Survey;

Thence S 68 degrees 10 minutes W 594 varas to the NW corner of said W. Houston Survey;

Thence S 940 varas to the SE corner of the H. Cox Survey and the NW corner of the F. Cuella Survey;

Thence S in the E line of said survey to the NE corner of the J.H. Eastman Survey;

NISD/CISD – 2951